In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-1672

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PETER J. RUMSAVICH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99-CR-883—**William J. Hibbler**, *Judge.*

ARGUED APRIL 3, 2002—DECIDED DECEMBER 17, 2002

Before COFFEY, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* Peter J. Rumsavich was charged and found guilty of five counts of mail fraud, in violation of 18 U.S.C. § 1341, and two counts of perjury, in violation of 18 U.S.C. § 1623. The district court sentenced Rumsavich to 75 months in prison followed by a 3-year term of supervised release and ordered the sentences and subsequent periods of supervision be served concurrently with each other, as well as ordering restitution totaling $571,700 to the victims and payment of a special assessment of $550. We affirm.

# I.

Beginning in the summer of 1979, Peter Rumsavich embarked upon the first of his numerous failed business ventures that tended to be funded by a selected group of naïvely trusting investors both in the city and suburbs of Chicago, Ill. Rumsavich incorporated three businesses— D'Martine Financial, D'Martine Food, G.P. Services, and Goo-Cheese Pizza—none of which was profitable for more than a short period of time. In May 1988, when Rumsavich was faced with the imminent collapse of the Goo-Cheese Pizza and D'Martine Financial enterprises, he sought to raise cash with the selling of $750,000 of so-called "D'Martine Food Services, Inc. Zero Coupon Corporate Bonds."

Rumsavich devoted extensive time and energy to making contact with thousands of individuals, and thereafter proceeded to identify and persuade certain unknowledgeable investors to purchase these bonds. He began by mailing more than 150,000 brochures and postcards to a targeted selection of people in neighborhoods known as being inhabited with an unusually large number of senior citizens with fixed incomes. The brochures invited the recipients to attend "financial seminars" conducted by Rumsavich at libraries and hotels in the nearby suburbs of Chicago. The brochures recited that Rumsavich was a former vice president for the investment firm of Dean Witter with impressive credentials as a "registry financial planner," a "certified financial planner," and a "registered financial planner." These claims were false: the position of a "registered financial planner" does not exist within the investment banking industry, Rumsavich never was a certified financial planner, and Rumsavich's only experience with managing portfolios was acquired during several years at Dean Witter where he was employed as a low-level office manager rather than a vice president of the company as represented.

However, according to the record, a large number of people, acting in reliance upon Rumsavich's misrepresentations, attended his seminars and listened (with dreams and hopes) to his promises of helping them take advantage of the supposedly low-risk, high-yield investment opportunities he represented to them. He presented each of the attendees with carefully crafted questionnaires designed to elicit specific information about their experience and knowledge of investing, their levels of income and wealth, and their financial histories. After collecting the completed questionnaires during his opening contact session with this select group of people, Rumsavich next engaged in a process of "cherry picking," weeding out and focusing only on those individuals whom he described as "suitable" investors and inviting them to his private office for one-on-one meetings where he promoted the D'Martine Food Services zero-coupon bond.

The record reflects that during these meetings, Rumsavich conducted himself like "a pitchman at a county fair," advising his soon-to-be victims that the bonds would pay an inflated annual interest rate of 12 percent, mature in six years, and repay each investor two-fold upon maturation. Just as Rumsavich had made misleading statements in his earlier brochures about his investment experience, so did he mislead investors during his individual meetings about the nature of the bonds. Rumsavich claimed, for example, that D'Martine Food was an Illinois corporation when, in fact, D'Martine has never been incorporated in any state. Rumsavich also referred to the bonds as "zero-coupon bonds" despite the fact that they resembled interest-bearing bonds in the sense that they were sold at face value rather than at a discount rate. Rumsavich further misled investors when talking to senior citizens and stating that "he would invest in something with security" and that his bonds in the food services industry were "a sure thing" with "no risk involved."

Rumsavich's "no-fail" bond-selling statements were clever but at the same time somewhat misleading, for at no time did he ever disclose, much less even infer that his prior track record when acting as the manager of pizza restaurants was miserable and/or that his D'Martine enterprise had been plagued with financial troubles and significant debt since its incorporation. In addition, Rumsavich never did make known that the proceeds from the bond sales were being used mainly to pay off his debts to Goo-Cheese Pizza and D'Martine Financial, in addition to his paying himself and his wife substantial salaries, despite the fact that she was neither an employee nor a member of the board of directors of D'Martine Food Services. He also found it to his benefit to use his client-investors' funds to help pay off his personal debts as well as the creditors of his failed limited partnership, G.P. Services.

After a federal grand jury indicted him on five counts of mail fraud in violation of 18 U.S.C. § 1341, and two counts of perjury in violation of 18 U.S.C. § 1623, Rumsavich entered pleas of not guilty on each count and the case went to trial before a jury for some seven days before the jury found him guilty on all of the seven counts.

Some three months after the entry of the judgment of guilty on all counts, U.S. District Judge William Hibbler conducted a lengthy sentencing hearing and heard testimony from a number of witnesses appearing on behalf of both the defendant and the Government. Many of the Government's witnesses were the investors whom Rumsavich had swindled. They testified that Rumsavich gained their trust and ultimately convinced them to purchase the bonds after he assured them that he was acting in their best interests and was committed to offering them prudent financial advice. Rumsavich's sales pitch lulled the victims into a sense of false confidence, and he also saw fit to send them fraudulent, pre-printed federal 1099 tax forms reflecting that they were earning

tax-deferred interest income that was not payable until the bonds matured six years from the date of issuance. In the minds of the unsuspecting investors, according to the record, the pre-printed tax forms legitimized the investments by reflecting that the investments were doing well and that Rumsavich was complying with Internal Revenue Service guidelines of reporting taxable income. In reality, Rumsavich was "borrowing from Peter to pay Paul," for his "investments" operated like a pyramid scheme funded entirely by the sale of bonds to other investors rather than any growth in corporate revenue or contributions from outside sources.

After receiving this testimony at the sentencing hearing and analyzing the arguments of the Government and the defendant, Judge Hibbler adopted the recommendation in the presentence report and imposed a 2-level sentencing enhancement, reasoning that Rumsavich "knew or should have known that many of the people who ultimately purchased the bonds were vulnerable victims because of their advanced age, their need to get solid retirement planning advice, and their overwhelming unsophistication in financial matters." U.S.S.G. § 3A1.1(b)(1). The judge also enhanced Rumsavich's sentence with a second 2-level enhancement after finding that he had abused a position of private trust as a financial planner by misleading his customers and using their money for improper purposes. § 3B1.3. Thus, after applying the relevant guideline limits for "vulnerable victim" and "abuse of trust" enhancements, the judge sentenced Rumsavich to a total of 75 months' imprisonment for committing five acts of mail fraud in violation of 18 U.S.C. § 1341 and two acts of perjury in violation of 18 U.S.C. § 1623. Each of the sentences imposed was ordered to run concurrent with each other, to be followed by three years of supervised release, with each period of supervised release also to run concurrent with each

other.[1] Rumsavich surrendered to the U.S. Marshals in June 2001 and presently is incarcerated at a minimum security federal prison in Wisconsin.

## II.

### 1.

On appeal, Rumsavich argues that the district court erred when it applied the vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1). We review the district court's legal interpretation of the Sentencing Guidelines *de novo* and the court's factual findings for clear error. *United States v. Parolin*, 239 F.3d 922, 928 (7th Cir. 2001). We are convinced that the trial judge's enhancement of Rumsavich's sentence under § 3A1.1(b)(1) was proper, for the record supports the finding that Rumsavich had reason to know that his premeditated, systematic pattern of defrauding investors was likely to harm the unsuspecting, innocent elderly victims whom he targeted and who were unusually vulnerable to his unlawful behavior.

### 2.

Section 3A1.1(b)(1) of the Sentencing Guidelines provides for a 2-level enhancement "if the defendant knew or should have known a victim of the offense was a vulnera-

---

[1] The maximum term of imprisonment on the five counts of mail fraud was five years for each count, for a possible total sentence of 25 years. 8 U.S.C. § 1341. The maximum term of imprisonment on the two perjury counts was five years for each count, for a possible total sentence of 10 years. 18 U.S.C. § 1341. The sentencing guidelines called for a sentence in the range of 63 to 78 months, based on Rumsavich's total offense level of 26 and his criminal history category of I. (PSR at 18.)

ble victim." The commentary to the Guidelines defines a "vulnerable victim" as a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct" committed by the defendant. U.S.S.G. § 3A1.1(b)(1) appl'n n.2. In cases where the defendant's actions and misdeeds have harmed multiple victims, the enhancement may be imposed if the defendant "targeted *any* of the victims because of their unusual vulnerability." *See United States v. Jackson*, 95 F.3d 500, 508 n.11 (7th Cir. 1996) (emphasis added). We have previously noted that "'vulnerability' is the sort of fact which the trial court is peculiarly well positioned to gauge" because the trial judge is in the best position to use his observations of the demeanor of the criminal defendant and/or witnesses as well as having an opportunity to review and analyze each of the documents and exhibits and hear the testimony while observing the mental, physical, and emotional states of the victims in order to assist him with assessing the damages inflicted upon them. *United States v. White*, 903 F.2d 457, 463 (7th Cir. 1990).

At the sentencing hearing, and after reviewing the record, the trial judge noted that the majority of Rumsavich's client-victims were elderly persons who lacked the necessary knowledge, experience, training, or personal judgment required to make intelligent investment decisions with respect to their retirement. Additionally, a number of them were widows who were dependent in the past on their former husbands for financial planning and advice. The district judge concluded that a vulnerable victim enhancement was appropriate, finding that Rumsavich deliberately and methodically used a series of targeted mailings, presentations, and one-on-one meetings as a means of discovering and capitalizing upon his researched knowledge about the victims' ages, severe physical or emotional difficulties, widowhood, pronounced need for investment

advice, limited incomes, and/or demonstrated lack of understanding about financial matters. As the district judge noted, "It was clear that [Rumsavich] did, in fact, target these particular individuals, knew of their particular financial situation, [and] used that information in such a manner as to approach them with certain opportunities that he knew they would be more likely to accept because of the lack of security that they now had with their particular investments."

On appeal, Rumsavich has devoted a large portion of his brief attempting to convince us that the defrauded individuals in this case were fairly sophisticated investors with a reasonable amount of business savvy and argues that none of the victims can properly be classified as "vulnerable victims." (Br. at 20-22.) This extended verbiage, however, falls far short of establishing that the trial judge committed reversible error, for even if we were to assume for the sake of argument that the nine victims selected and identified in Rumsavich's briefs were experienced investors, we are convinced that an enhancement was proper, as there is no question that at least one victim, Ms. Gladys Paine, qualifies as a "vulnerable victim" within the meaning intended by the Guidelines.

By sending out the brochures to those residing in areas with a disproportionate number of elderly people, Rumsavich piqued Paine's attention, lured her to one of his seminars, and preyed upon her fears of bankruptcy with the presentation of pamphlets titled, "The Cruel Cost of Long-Term Care," "Long-Term Health Care and Poverty: Price of Nursing Care Is Poverty, Survey Says," and "A Retiree's Biggest Poverty Trap: Nursing Homes." Rumsavich convinced Paine to fill out a selected number of questionnaires in an attempt to gain a wealth of information focusing on the question of whether she had appreciable cash reserves and, if so, what amount could be invested without necessitating the securing of a loan or

sale of other assets. From these questionnaires, Rumsavich learned that Paine had retired, having resigned from her position as a nursing home administrator in 1987, and had recently suffered the loss of her husband. Next he determined that Paine was, in his words, a "suitable" target for his investment scheme, and he telephoned Paine and invited her to meet with him for a second, personal, one-on-one interview at a sprawling office complex in Rolling Meadows, Ill., which he held out to be the office of his so-called "financial planning agency."

During their tête-a-tête, Paine confirmed that she was "not very knowledgeable" in financial affairs and that her now-deceased husband had managed the family's entire investment portfolio. Rumsavich gained Paine's confidence by misrepresenting the nature of his investment scheme and convincing Paine he was concerned about her financial well-being. He further promised Paine that he would offer her financial security and mischievously recommended that she purchase an $18,000 bond at a price that coincided exactly with the amount of money she had received from her husband's insurance policy upon his death. At this time, Rumsavich obviously knew that his food-service industry bonds were risky investments, to say the least, for none of his retail pizza businesses ever turned a profit and each one was bordering on bankruptcy as early as February 1988. Nevertheless, following their first meeting in June 1988, Rumsavich relieved Paine of her retirement nest egg and all of the monies he could get his hands on. Rumsavich pulled off this feat by lulling Paine into a false sense of security with the alleged mailing of the previously referred-to fraudulent, pre-printed 1099 tax forms which indicated that her investments were earning taxable income in the form of accrued interest. It is exactly this type of "lulling" correspondence and misleading salesmanship that courts have on numerous occasions held to support convictions

under the mail fraud statute. *See*, *e.g.*, *United States v. Lang*, 474 U.S. 438, 452 (1986); *United States v. Sampson*, 371 U.S. 75, 80-81 (1962); *United States v. Bach*, 172 F.3d 520, 521-22 (7th Cir. 1999); *United States v. Brocksmith*, 991 F.2d 1363, 1367-68 (7th Cir. 1993).[2]

Note two of the Application Notes to § 3A1.1 provides that "[t]he ['vulnerable victim'] adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim." We agree with the court's decision to enhance Rumsavich's sentence because he deliberately, systematically, and purposefully targeted Paine and a number of other widowed, aged, unsophisticated and unwary investors as victims in his

---

[2] In addition to appealing from the district court's sentencing judgment, Rumsavich also appeals from his conviction under the federal mail fraud statute, 18 U.S.C. § 1341, on the basis that the district court should have dismissed such charges as untimely. (Br. at 11-15.) The federal mail fraud statute has a five-year statute of limitations that "begins to run from the date of mailing of the fraudulent information." *United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999). Although Rumsavich admits that he mailed IRS 1099 Forms to his victims as late as March of 1999, well within the five-year limitations period, he claims that such mailings were a mere effort to "conceal a prior fraud scheme," (Br. at 15) and that they were not part of the fraud scheme itself. (Br. at 14)

As stated above, we agree with the Government that the 1099 forms constituted "lulling" correspondence, and that Rumsavich's mailing of the forms was done in furtherance of his ongoing scheme to defraud his investors. *See supra.* Accordingly, because Rumsavich continued to engage in acts of mail fraud through March of 1999, the Government's mail fraud charges were timely filed within the five-year statute of limitations, and the district court properly denied Rumsavich's Motion to Dismiss such charges as untimely.

high-risk business ventures and then proceeded to systematically and deliberately defraud them. As we explained in Part I, Rumsavich began by mailing brochures to residents living in areas inhabited with a large number of unsophisticated elderly retirees. Through the use of carefully crafted questionnaires he presented to the retirees who had on prior occasions received the same flier and thereafter attended his investment seminars in the city and suburbs of Chicago, Rumsavich was able to further narrow down and identify even more naïve, gullible individuals who: (1) had an unusual need for sound advice from a financial planner; and (2) lacked more than a basic understanding of investment strategies and theories. It was only towards this group of people—those financially inexperienced elderly people who needed Rumsavich's help and were particularly likely to rely upon his advice to their detriment—that Rumsavich targeted his fraudulent investment schemes.

We are convinced that an unscrupulous person like this—who methodically schemes and plans to separate out those elderly and inexperienced investors in dire need of prudent investment planning and thereafter proceeds to cheat them out of their life savings—is eligible for a "vulnerable victim" enhancement no less than a huckster who peddles "an ineffective cancer cure" to those unfortunate people dying of cancer. U.S.S.G. § 3A1.1 appl'n n.2. We agree with the trial judge's determination that Rumsavich's victims were vulnerable because they had "a lower than average ability to protect themselves" against his fraudulent investment programs, *United States v. Grimes*, 173 F.3d 634, 637 (7th Cir. 1999), due to a combination of their age, severe physical or emotional difficulties, widowhood, pronounced need for sound and truthful investment advice, limited incomes, and frequently combined with a demonstrated lack of knowledge and understanding of financial ventures. *See* T.M. Murch, Note,

*Revamping the Phantom Protections for the Vulnerable Elderly*, 6 ELDER L.J. 49 (1998). We refuse to hold that the judge committed clear error when he enhanced Rumsavich's sentence for preying upon these unusually vulnerable investors, *see Parolin*, 239 F.3d at 927, and also for abusing a position of trust as a financial planner for elderly persons. *See United States v. Stewart*, 33 F.3d 764, 767-71 (7th Cir. 1994); *United States v. Dobish*, 102 F.3d 760, 762 (6th Cir. 1996) (per curiam). "One adjustment focuses on the victim, who was demonstrated to be vulnerable. The other adjustment looks to the conduct of the offender, who abused a position of trust." *United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994).

## III.

The trial court acted within its discretionary boundaries when enhancing Peter J. Rumsavich's sentences based upon a clear and convincing finding that he deliberately abused a position of trust and cruelly inflicted harm upon at least one vulnerable victim. Rumsavich's remaining arguments are without merit and we see no need to address them. The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*
