In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1621

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY A. BOISTURE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. EV 5-43-CR-01—**Richard L. Young**, *Judge*.

ARGUED JANUARY 7, 2008—DECIDED APRIL 20, 2009

Before POSNER, ROVNER, and WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge.* As partial owner of the environ-
mental consulting firm Environmental Consulting and
Engineering Company ("Environmental Consulting"),
Timothy A. Boisture participated in a multi-part scheme
to defraud, among others, his company and the
Indiana Department of Environmental Management. A
grand jury returned a superseding indictment charging
Boisture with three counts of mail fraud, *see* 18 U.S.C.

§ 1341, one count of money laundering, *see* 18 U.S.C. § 1957, and one count of making false statements, *see* 18 U.S.C. § 1001. A jury convicted him on just two counts—both for mail fraud. Boisture appeals, arguing that the evidence against him was insufficient as to one of his mail fraud convictions.

## I.

In 1999, Boisture, on behalf of Environmental Consulting, bid on and was awarded an environmental remediation project through the Indiana Department of Environmental Management. Initially, the project entailed cleaning up oil and waste storage tanks and plugging approximately twelve oil and oil injection wells at the inactive Claremark Oil Production Facility in Vanderburgh County, Indiana. Later that same year, the project expanded to include plugging thirty-nine additional wells near the Bayou Creek, also located in Vanderburgh County. As the regulatory agency charged with enforcing state environmental law, the Department of Environmental Management paid for the work. The Indiana Department of Natural Resources ("DNR") oversaw the closure of the wells. Because the wells were located in a flood plain of the Ohio River, Indiana was entitled to reimbursement from the federal Oil Spill Liability Trust Fund, which was administered by the United States Coast Guard. The United States Environmental Protection Agency also oversaw the project to ensure that it met the Trust Fund's criteria. The Coast Guard reimbursed the Department of Environ-

mental Management approximately $370,000 for the work at the Claremark Oil and Bayou Creek sites.

Boisture subcontracted with Bi-State Pipe Company, Inc. and an individual named Carl F. Hanisch to plug the Claremark Oil and Bayou Creek wells. DNR regulations specified that a DNR inspector be present at the well during certain closure operations. The DNR inspector present at the wells with Boisture and Hanisch was Donald Veatch.

The project as a whole was governed by a document entitled the "Claremark Oil Company Well Abandonment & Cleanup Agreement." As relevant here, the Claremark Agreement specified that the Department of Environmental Management would pay Environmental Consulting $4,085 for each well plugged. In addition to the set fee, Environmental Consulting could recoup additional costs for specified "Out of Scope" services. These services included (1) installing a cast iron bridge plug (an underwater mechanical device that prevents oil from flowing upward into freshwater and allows the well to be reopened at a later date) inside a well during the closure, (2) renting tubes used to inject cement during the well closure, and (3) disposing of wastewater generated during the plugging and associated cleanup of the site.

After Hanisch incurred unexpected out-of-pocket costs drilling out and replugging six of the wells, he and Veatch devised a scheme to recoup some of the excess costs. The scheme capitalized on the "Out of Scope" services by charging for cast iron bridge plugs where none were

installed and charging for tubing that was never rented.[1] Hanisch and Veatch included Boisture in the scheme because he would be approving the charges for the work and would need to assist with the documentation required by the various agencies involved. As relevant here, Bi-State Pipe Co. (through Hanisch) billed Environmental Consulting for installing bridge plugs in twenty-three of the thirty-nine wells in the Bayou Creek project when in fact no bridge plugs were installed. As the DNR inspector, Veatch certified that the bridge plugs had been installed, and Environmental Consulting (through Boisture) in turn billed the Department of Environmental Management for the nonexistent bridge plugs.

Although the success of the scheme depended on the submission of a number of documents containing false information—from Bi-State and Environmental Consulting's invoices to required weekly pollution reports submitted to the EPA and the Coast Guard—the government did not rely on these documents in its prosecution of Boisture. This is because the majority of the documents in furtherance of the scheme were mailed outside of the five-year statute of limitations applicable to § 1341. *See United States v. Rumsavich*, 313 F.3d 407, 413 n.2 (7th Cir. 2002) (noting five-year statute of limitations). The gov-

---

[1] Veatch and Boisture also devised a second scheme capitalizing on the third "Out of Scope" service—wastewater disposal. They arranged for a company owned by Veatch to dramatically overcharge Environmental Consulting for wastewater disposal and then kick back most of the excess to Boisture.

ernment's case thus hinged on false representations in two of the twenty-three so-called "Plugging and Abandonment Reports" ("P & A Reports") required by DNR procedures for each well closed. The P & A Reports, which were signed by Veatch and Hanisch, contained different sections to be completed at the time the well was plugged, at the time the site was cleaned and restored, and a final section to be completed by the DNR Division of Oil and Gas in Indianapolis, Indiana.

In total, Boisture submitted invoices to the Indiana Department of Environmental Management seeking reimbursement for just over $44,000 in fraudulent charges: approximately $12,000 for nonexistent cast iron bridge plugs and around $32,000 in false tubing rental charges. In January 2000, Hanisch gave Veatch a $3,780 check for his role in the scheme, and later that year Hanisch also gave Boisture $3,780 for his participation.

Boisture was convicted after a jury trial of two counts of mail fraud, *see* 18 U.S.C. § 1341. The jury acquitted him of the three other counts charged in the superseding indictment. Boisture then moved for a judgment of acquittal, *see* Fed. R. Crim. P. 29, and for a new trial, *see* Fed. R. Crim. P. 33. The district court denied the motions, and Boisture was subsequently sentenced to concurrent 60-month prison sentences on the two counts of conviction. He was also ordered to pay nearly $500,000 in restitution.[2] He appeals, contending that there was insufficient evi-

---

[2] The large sum includes restitution for the separate wastewater scheme as well as the estimated cost of drilling out and replugging the twenty-three wells.

dence of the mail fraud charged in Count I of the superseding indictment.

## II.

In challenging the sufficiency of the evidence, Boisture faces a "nearly insurmountable hurdle." *E.g.*, *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009) (citation and internal quotation marks omitted). We do not reweigh the evidence, nor do we second-guess the jury's credibility determinations. Instead, we review the evidence in the light most favorable to the prosecution, and will overturn the verdict only if the record contains no evidence from which a rational jury could have returned a guilty verdict. *See, e.g.*, *United States v. Millbrook*, 553 F.3d 1057, 1065 (7th Cir. 2009).

The mail fraud statute prohibits using the mails to execute any "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. To sustain a mail fraud conviction, the government must prove that the defendant (1) participated in a scheme to defraud; (2) intended to defraud; and (3) used the mails to further the fraudulent scheme. *E.g.*, *United States v. Jackson*, 546 F.3d 801, 810 (7th Cir. 2008).

To prove that Boisture committed the mail fraud alleged in Count I, the government relied on the mailing of two of the P & A Reports from the DNR's Evansville, Indiana field office to its Indianapolis office in June of

2001. At the time of the alleged mailings, all of the wells specified in the contract had been plugged, and Boisture and his co-schemers had received payment for their work. Boisture thus contends that the government failed to prove that these mailings were in furtherance of the scheme to defraud. He also maintains that there was insufficient evidence that anyone in the scheme knew or could foresee that the P & A Reports would be mailed to the Indianapolis DNR office. We consider his arguments in turn.

According to Boisture, the two P & A Reports were unrelated and unnecessary to the scheme to defraud the Indiana Department of Environmental Management. In order to prove that the mails were used to further the scheme, the government must demonstrate that the mailing of the P & A Reports was "part of the execution of the fraud." *Kann v. United States*, 323 U.S. 88, 95 (1944). The mailings need not, however, be central to the scheme; it is sufficient if they are "incident to an essential part of the scheme or a step" in the plot. *Schmuck v. United States*, 489 U.S. 705, 711 (1989) (internal citation and quotations omitted); *see also United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002). In other words, the mailings must contribute to the success of the scheme. *Schmuck*, 489 U.S. at 711-12; *United States v. Franks*, 309 F.3d 977, 978 (7th Cir. 2002).

As noted above, each P & A report contains three sections: one completed at the time the well is plugged, one completed when the well site is restored and any debris removed, and a final section completed by the

Indianapolis office of the DNR to facilitate the release of a statutorily-required bond on the well. *See* 312 Ind. Admin. Code § 16-4-1. Shortly after the wells were plugged, Boisture submitted invoices to the Indiana Department of Environmental Management for payment. The Department then paid Environmental Consulting with a series of checks issued in late 1999 and early 2000. Veatch completed the second section certifying that the site had been remediated in June 2001, approximately a year-and-a-half after the actual well closures[3], and he then submitted the P & A Reports to the local DNR field office in Evansville, Indiana. From there, the Evansville office sent the Reports to the main office in Indianapolis for processing of the bond release.

Boisture maintains that the June 2001 mailing of the P & A Reports and attendant release of the bond (held by

---

[3] In his reply brief, Boisture points out that under the Indiana Administrative Code, the site restoration portion of the P & A Report should have been completed within 6 months of the well closure. He argues that Veatch's failure to timely complete the site restoration portion caused the two P & A Reports to work *against* the scheme because they were not timely completed. *See United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir. 1992) (mailing that works against fraud will not support conviction). We note that it is unlikely that the untimely completion of one portion of the P & A Reports caused them to work against the scheme as a whole. We need not decide, however, because Boisture waived this argument by raising it for the first time in his reply brief. *E.g.*, *United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008).

a third party unaffiliated with Boisture, Veatch, or Hanisch) was irrelevant to the fraudulent scheme to collect money for bridge plugs that were never installed. In support of his theory, Boisture points to *United States v. Maze*, 414 U.S. 395 (1974). The defendant in *Maze* stole his roommate's credit card and used it to pay for food and lodging on a cross-country jaunt in his roommate's car. *Maze*, 414 U.S. at 396. The Court deemed Maze's scheme complete when he checked out of the motels rented with his roommate's credit card; the subsequent mailing of the invoices from the motel to the bank and then to Maze's roommate for payment determined who would bear the loss but did nothing to advance the scheme. *Id.* at 402.

Boisture argues that the same is true of the P & A Report mailings: Boisture and his co-schemers had succeeded in collecting money for work they did not perform in early 2000—long before the final sections of the P & A Reports were completed in June of 2001. Moreover, the reports simply ensured that the bond on the wells was released, an issue that had no bearing on the scheme to defraud. The government, for its part, maintains that the false P & A Reports were an important part of the scheme as a whole, in that they worked together with the many other false documents submitted to governmental agencies to ensure that Boisture and his co-schemers both received and retained the overcharges.

The fact that Boisture had submitted the fraudulent invoices and received payment from the Department of Environmental Management does not itself negate the

possibility that the P & A Reports furthered the scheme. Ample evidence existed that Veatch, Hanisch, and Boisture sought not simply to fraudulently obtain payment, but to retain their ill-gotten gains by avoiding investigation or detection. *See United States v. Bach*, 172 F.3d 520, 522 (7th Cir. 1999) (mailings that failed to elicit additional money from fraud victims furthered scheme to "obtain *and retain"* payments by duped investors) (emphasis in original).

Unlike the later-mailed invoices in *Maze*, the P & A Reports here tied into and helped complete the scheme as a whole. Although they had received payment for the well closures, Boisture, Veatch, and Hanisch had a strong incentive to keep all the documentation surrounding the well closures uniform so as to avoid arousing suspicion. The invoices that Boisture had previously submitted to the Indiana Department of Environmental Management contained charges for bridge plugs in the two wells identified in the P & A Reports. Documenting the installation of bridge plugs on the P & A Reports ensured that all of the paperwork surrounding the job was consistent. Moreover, discrepancies between the invoices and the Reports could provide a tip-off to the fraud.

Boisture insists that because the invoices and P & A Reports were submitted to different agencies, the contents of the P & A Reports (whether truthful or falsified) was irrelevant to the scheme. Environmental Consulting submitted its invoices to the Indiana Department of Environmental Management, and that agency paid

Boisture, not the DNR. As Boisture points out, the DNR never receives copies of the invoices, and so a comparison between the invoices and the P & A Reports is unrealistic. This may be, but Boisture's argument ignores the possibility that such a comparison could take place at other levels. For example, Environmental Consulting's bookkeeper testified that she would have been alerted to a problem if she had seen a discrepancy between the invoices and the P & A Reports.

Moreover, Boisture's focus on whether such a discrepancy was likely to be discovered misses the point. As Hanisch explained in his testimony, the DNR did not consider the plugging process finished until the completed P & A Reports were received and the bond on the wells was released. The fact that the bond release had no bearing on the payment Boisture received does not mean that the P & A Reports themselves were irrelevant to the scheme's success. On the contrary, the fraudulent P & A Reports completed the scheme by creating a consistent picture for all involved agencies of cast iron bridge plugs where none existed. The false information in the P & A Reports thus helped avoid detection, even if only tangentially: accurately stating in the reports that no plugs were installed may not have immediately raised suspicion, but it would have created an inconsistent paper trail capable of illuminating the fraud. *See United States v. Szarwark*, 168 F.3d 993, 995 (7th Cir. 1999) (noting that courts must consider "full scope of the scheme when determining the sufficiency of the mailing element") (citation and internal quotations omitted); *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir. 1994)

("Avoidance of detection is often a material part of a fraudulent scheme; for an illegal scheme would hardly be undertaken were there to be no profit to the plotters."). And Hanisch testified at trial that he knew the final step of the well-plugging process was the bond release in Indianapolis and that the scheme entailed submitting the same false information on both the invoices and the P & A Reports.

Unlike the indictment in *Maze*, which charged the defendant with unlawfully obtaining goods and services on four discrete occasions at four specified motels, the indictment here alleged a broad scheme to defraud the Indiana Department of Environmental Management. *See United States v. Franks*, 309 F.3d 977, 978 (7th Cir. 2002) (distinguishing broad scheme covering 449 checks from a case charging "three schemes of one check apiece" that had succeeded once each check reached the drawee bank). Admittedly, the government's case could have been stronger: the false invoices submitted and other false documentation furthered the fraud far more directly than the two P & A Reports referenced in Count I. Nonetheless, the jury could have inferred from the evidence that the two P & A Reports amounted to the final step in a broad scheme to both dupe the Indiana Department of Environmental Management into overpaying and to avoid detection for the fraud and thereby retain the overpayments. *See Schmuck*, 489 U.S. at 712 (mailings that did not contribute directly to scheme still supported conviction where they were necessary to an essential part of the scheme); *Fernandez*, 282 F.3d at 507-08 (upholding convictions based on mailings that assisted in

concealing "true nature of the scheme" and falsely portraying construction firm as legitimate).

Boisture next claims that the government failed to prove that any of the three schemers knew or could have foreseen that the P & A Reports would be mailed. Although the government need not prove that using the mail is an essential part of the scheme, *United States v. Young*, 232 U.S. 155, 161-62 (1914), it must demonstrate that Boisture knowingly caused the mails to be used in furtherance of the scheme. *E.g.*, *United States v. Hickok*, 77 F.3d 992, 1004 (7th Cir. 1996). The government could satisfy its burden with evidence that either Veatch or Hanisch, whose knowledge could be imputed to Boisture, could reasonably foresee that the P & A Reports would be mailed in the ordinary course of business. *See Pereira v. United States*, 347 U.S. 1, 8-9 (1954); *United States v. Useni*, 516 F.3d 634, 648 (7th Cir. 2008).

Boisture asserts that the government's evidence on this point fell short because it failed to demonstrate that Veatch or Hanisch either knew or could foresee that the P & A Reports would be mailed from Evansville to Indianapolis. Boisture maintains that the government devoted considerable energy trying to prove that the forms were actually mailed, but that it neglected to put forth evidence regarding any of the co-schemers' expectations about the use of the mails. It is true that most of the evidence at trial about the mailings centered on how they arrived in Indianapolis. Because the government lacked direct evidence that the two P & A Reports were mailed from the Evansville office to the Indianapolis

office, it was obliged to prove circumstantially that Veatch submitted the reports in Evansville and that they were not hand-delivered to their final destination in Indianapolis. The government succeeded on this front with testimony from the only DNR employee who traveled between the two offices during the relevant time period: he testified that he did not hand-deliver the reports. That same employee also testified that he stamped each piece of mail as he opened it with a date stamp like the one borne by each of the P & A Reports.

But this was not the only evidence on the mailing element. There was also evidence presented that Veatch could have foreseen the use of the mails. Veatch testified that he knew the final portion of the P & A Report—the bond release—was completed and stored at the main DNR office in Indianapolis. He also testified that he submitted the P & A Reports with the other two sections completed to the Evansville office. The jury could infer from this testimony that Veatch could have reasonably foreseen that the forms would be mailed from the Evansville office to the Indianapolis office for completion. Although the jury was not required to make such an inference, it was certainly a plausible one. *See United States v. Haskins*, 511 F.3d 688, 693 (7th Cir. 2007). We are thus unconvinced by Boisture's assertion that there was insufficient evidence of the schemers' knowledge that the mails would be used.

## III.

Although the question is a close one, we conclude that sufficient evidence supports the jury's conclusion that the mailing of the two P & A Reports furthered the

scheme to defraud. Likewise, the evidence was sufficient on the mailing aspect of Count I. We therefore AFFIRM Boisture's convictions and sentence.