In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2511

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SORIN ADRIAN OROS,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 00125—**Amy J. St. Eve**, *Judge*.

ARGUED APRIL 8, 2009—DECIDED AUGUST 25, 2009

Before EASTERBROOK, *Chief Judge*, and KANNE and
WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge.* At around midnight on December 12, 2006, Chicago police officers spotted a Lexus and a Lincoln Navigator parked in a dark corner of a Shell gas station. Inside the Lexus were two men: Sorin Adrian Oros, a real estate developer, and David Johnson, the Supervisor of Building Inspectors for the City of Chicago Department of Buildings. The officers, believing

they were about to foil a drug deal, approached the vehicle to investigate. After searching both men and the vehicle, the officers found no drugs but Johnson had over $19,000 in his pocket, $12,000 of which came from Oros. They also found blueprints—architectural drawings of three properties. Oros told the officers that he had paid Johnson the $12,000 to have his plans "expedited" through the City's rigorous approval process. The government called it bribery, and the jury agreed, convicting Oros of bribery, in violation of 18 U.S.C. § 666(a)(2). Oros now appeals his conviction and sentence. Because the testimony and circumstantial evidence presented at trial support his conviction as well as the district court's findings at sentencing, we affirm both.

## I. BACKGROUND

In 2006, New City Builders ("New City"), a condominium conversion company, contracted with Algin Construction and Development to prepare architectural plans for two rental properties it planned to convert to condominiums. New City sought to add two units to each property, and Algin agreed to complete the steps necessary to obtain permits for both projects. This included scheduling intake meetings with the City of Chicago Department of Construction and Permits ("DCAP") and making any required changes to the plan if the original version did not meet the Department's requirements.

In an effort to get New City's plans approved, Oros, who was working for Algin Construction at the time, contacted

David Johnson, the Supervisor of Building Inspectors for the Department of Buildings. The two men met at a Shell gas station at around midnight, and Oros gave Johnson $12,000 in cash while both men sat in the front seat of Oros's Lexus. Three Chicago police officers on narcotics patrol, who had been watching the activities at the gas station, proceeded to intercept what they thought was a drug deal. The officers ordered both men out of the car and patted them down, finding $19,301 in Johnson's pockets. The officers then searched Oros's car and found three sets of architectural drawings for three different properties.[1] Both men accompanied the officers to the police station where Oros was placed under arrest. During a post-arrest interview, Oros told officers that he gave Johnson $12,000 and the architectural drawings "for the purpose of having them expedited," and that he had met with Johnson 20 to 30 times over the past two to three years to pay him cash for expedited approvals of other projects. As a result, the Inspector General filed a criminal complaint, and a federal grand jury returned a two-count indictment charging Oros with conspiracy to commit bribery, in violation of 18 U.S.C. §§ 371, 372 and bribery, in violation of 18 U.S.C. § 666(a)(2).

At trial, Oros argued that the payments to Johnson were not bribes because he thought Johnson was a legiti-

---

[1] Two of the blueprints were for properties owned by New City, but the owner of the third property is unclear from the record.

mate "expediter." In order to fully comprehend Oros's defense, it is important to have a basic understanding of Chicago's building permit approval process as it existed in 2006, and the role of an expediter in this system.[2] At that time, obtaining approval for standard building projects in the City of Chicago was a complicated, tedious process. Each applicant's building plans were subjected to the scrutiny of three main departments: the Department of Zoning, DCAP, and the Department of Buildings. The Department of Zoning examined the applicant's plans or architectural drawings to ensure that they complied with the zoning and landscape ordinance. DCAP also inspected the plans and issued permits prior to construction if the project satisfied the city's building code requirements. During its review, nine examiners of different disciplines (architectural, electrical, plumbing, ventilation, refrigeration, fire, accessibility, structural, and environmental) reviewed the plans and the corresponding code requirements for each area. Finally, building inspectors at the Department of Buildings physically inspected the properties to ensure that the completed projects were consistent with the building codes and with the architectural drawings that DCAP had approved.

Shepherding one's project through all three departments required a significant investment of time (i.e.,

_____

[2] The process for obtaining approval for building projects has changed since 2006. Most notably, the Department of Construction and Permits and the Department of Buildings merged.

meetings with DCAP employees, making corrections or adjustments to conform with the building codes, reviewing the adjustments with DCAP, etc.), so much so that some building owners were willing to pay expediters to help them navigate the process. The expediters' duties often included preparing the application beforehand to minimize errors, setting up appointments and meeting with DCAP employees, and even standing in line if necessary. Expediters were required by the Departments, but not under city or state law, to register and to indicate all who worked for them.

During trial, the government presented a number of witnesses and exhibits to demonstrate that Oros had been involved in a conspiracy to obtain approval of his building projects by offering bribes to employees from different Departments, and that he knew the people he paid were not expediters. First, Johnson testified that Oros paid him and other city employees multiple times to get building plans approved, along with other various favors. One such favor included manipulating the Department of Buildings' mainframe computer which stored the different zoning ordinances' requirements. To determine whether a building project complied with the zoning and landscape ordinance for the area, the Department of Zoning generally compared the building plans to the requirements in the mainframe computer, and rarely, if ever, looked to the actual ordinance. So if one altered the requirements in the computer, a building that did not comply with the zoning ordinance still could have been approved by the zoning department, as long as it complied with the

new, doctored restrictions—it would not matter that it was inconsistent with the actual ordinance because the department rarely looked to it. The government also presented summary charts of telephone calls made from June 1, 2005, to December 12, 2006, between Oros, Johnson, and other individuals whom Johnson claimed were involved in the bribery scheme. Finally, on a number of occasions, the government highlighted the "clandestine" nature of Oros and Johnson's gas station meeting, which, it claimed, resembled a drug deal more so than a legitimate business transaction.

The jury acquitted Oros of the conspiracy charge but convicted him of bribery, in violation of 18 U.S.C. § 666(a)(2). At the sentencing hearing, the district court found, based on Johnson's testimony, that Oros paid a total of approximately $59,000 in bribes and sentenced him to 33 months' imprisonment, two years' supervised release, 200 hours of community service, a $5,000 fine, and a $100 special assessment. Oros appeals his conviction and sentence.

## II. ANALYSIS

### A. Admission of the Summary Charts Was Harmless Error

The first issue we address is whether the district court erred in allowing the government to present charts to the jury summarizing telephone and bank records that were not properly admitted, and, if so, whether that error requires a reversal. We review the district court's

interpretation of the Federal Rules of Evidence de novo, *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008), and the decision to admit the summaries for an abuse of discretion, *United States v. Turner*, 400 F.3d 491, 498 (7th Cir. 2005).[3] We will not reverse the district court's ruling "if we are convinced that the error did not influence the jury . . . and can say with fair assurance . . . that the judgment was not substantially swayed by the error." *United States v. Reyes*, 542 F.3d 588, 593 (7th Cir. 2008) (citing *United States v. Dennis*, 497 F.3d 765, 769-70 (7th Cir. 2007)). At trial, the government informed the court that it intended to introduce summaries of voluminous bank and telephone records under Federal Rule

---

[3] The government suggests in its brief that Oros's initial objection to the summaries was based on the government's failure to admit the underlying records. It claims that Oros changed the nature of his objection in his post-trial motion when he asserted that the government did not lay a proper foundation. After reviewing the trial transcript, it appears that Oros's initial objection was also based on the lack of foundation for the underlying records. At one point, one of Oros's attorney said, "Well if the proper foundation is laid, then I'm not going to challenge the [summaries]." Later on in the discussion, Oros's other attorney said, "the records, themselves, are hearsay unless they're non-testimonial hearsay, unless there's an exception to the hearsay rule. And they can lay that foundation if it's true." From these statements and others, we conclude that Oros's initial objection was based, at least in part, on the absence of a proper foundation for the underlying records, and not just the failure to admit them. As a result, abuse of discretion is the appropriate standard of review.

of Evidence 1006. The parties then debated over whether the underlying records needed to be certified, or whether a custodian had to take the stand to lay the proper foundation for the records. The district court sided with the government, finding that because the government was only introducing the summary (and not the underlying records themselves), no certification or testimony from a custodian was required.

Federal Rule of Evidence 1006 allows a party to present, and enter into evidence, a summary of voluminous writings, recordings, or photographs. This provision, however, is not an end around to introducing evidence that would otherwise be inadmissible; therefore, in applying this rule, we require the proponent of the summary to demonstrate that the underlying records are accurate and would be admissible as evidence. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (citing *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir. 1990)). It is the latter requirement (that the underlying records be admissible) that created much confusion at trial.

Both parties agree that the underlying records were hearsay, and therefore inadmissible unless they satisfied one of the hearsay exceptions. The government presented Inspector David Hodapp to testify as to how he obtained the records (via trial subpoena), and it believes that was sufficient to demonstrate admissibility. The government appears to argue that since it was not required to admit the records, the district court was within its discretion to determine, based on Inspector

Hodapp's testimony, that the records were of the type "commonly viewed as trustworthy" that would have been admissible under the business records exception, Federal Rule of Evidence 803(6). The problem with this argument is that Inspector Hodapp's testimony falls short of the requirements set by Rule 803(6). Under that provision, the following *is not* excluded by the hearsay rule:

> A memorandum, report, [or] record . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the [record] . . . all as shown by the *testimony of a custodian* or other qualified witness, or *by certification* that complies with Rule 902(11), Rule 902(12) or a statute permitting certification . . . .

Fed. R. Evid. 803(6) (emphasis added). The government did not present any testimony to establish that the records were kept in the course of a regularly conducted business activity, nor did it provide a certification. Without these steps, the government could not have laid the foundation necessary to demonstrate the admissibility, under the business records exception, of the underlying records or the summaries of those records. *See United States v. Samaniego*, 187 F.3d 1222, 1224 (10th Cir. 1999) (finding that the district court erred by allowing the government to admit summaries without "lay[ing] a foundation for application of the business

records exception"); *see also* 29A Am. Jur. 2d *Evidence* § 1079 (2009) ("Since the proponent [of a summary] must establish that the underlying documents are themselves admissible, the same general foundation must be laid as if the underlying materials were actually being offered in evidence . . . ."). Indeed, there may be some instances where the foundation for admissibility under Rule 803(6) can be established by "judicial notice of the nature of the business and 'the nature of the records *as observed by the court . . .,*'" *Samaniego*, 187 F.3d at 1224 n.1 (citing *United States v. Johnson*, 971 F.2d 562, 571 (10th Cir. 1992) (emphasis added)); however, that is not what happened here. The district court did not examine the records, nor did it give any indication that it was taking judicial notice of them. Instead, the court maintained that the government was not required to lay the proper foundation for the underlying records because they were not being admitted into evidence. The government did not satisfy Rule 803(6)'s foundational requirements, and there is simply no basis for the assumption that the court would have taken judicial notice of the underlying documents' admissibility.[4]

---

[4] The government relies on *Coates v. Johnson & Johnson*, 756 F.2d 524, 549-50 (7th Cir. 1985), to argue that the district court was within its discretion to admit the underlying records, based on Inspector Hodapp's testimony as to how he obtained the records. In *Coates*, we affirmed the district court's decision to admit an employer's disciplinary memoranda under Rule 803(6) because we knew that the memoranda were

(continued...)

*See id*. Therefore, the summary charts should not have been admitted.

This does not entitle the defendant to a new trial, however, if we determine that the error was harmless, *United States v. Lee*, 558 F.3d 638, 649 (7th Cir. 2009), or, in other words, if it did not have a "substantial and injurious effect or influence on the jury's verdict." *United States v. Jarrett*, 133 F.3d 519, 529 (7th Cir. 1998) (citing *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir. 1993)). The government submitted a chart that listed all of Oros's properties to show the jury that Oros was an experienced property owner. From this the jury was to infer that he could not have been duped so easily into believing Johnson was an expediter. The chart was based largely on the unauthenticated bank records, but also, in part, on the City of Chicago building permits, which were admitted into evidence. Even without the bank records, the evidence at trial demonstrated that Oros had obtained building permits for at least six of his

---

[4] (...continued)

prepared by the plaintiff, "were part of the systematic conduct of running a business; and were kept according to a regular procedure [ ] for a routine business purpose." *Id*. at 550. In other words, we noted that the memoranda essentially met the requirements of the business records exception. Here, nothing from Inspector Hodapp's testimony tells us whether the records were kept in accordance with regularly conducted business activity, and rightfully so because he doesn't work for the bank or phone company. *Coates* does not alleviate the government's burden to lay the proper foundation.

properties, three of which were twenty-dwelling units. The inference that Oros was an experienced property owner could easily have been drawn from these properties—the jury did not need to delve any further to reach that conclusion. Admitting the property summary chart in this case caused no prejudice to the defendant.

The admission of the telephone summary charts was equally harmless. The charts showed the total number of phone calls between Oros, Johnson, and the other alleged conspirators from June 1, 2005, through December 12, 2006 (chart 1); the total number of calls broken down by the month (chart 2); the number of calls Oros made to Michael Reese, one of the co-conspirators (chart 3), and Johnson (chart 4) each month; and the phone calls made on December 12, 2006, the day of the alleged bribe (chart 5). The primary purpose of this evidence was to demonstrate the existence of a conspiracy between Oros, Johnson, and others—a charge of which Oros was ultimately acquitted. This was clear at closing arguments where the government first addressed the phone call summary charts by stating, "[l]et's start, first of all, by talking about the conspiracy . . . [w]hat other evidence have you seen and heard during this trial that proves to you that those details—who the members were . . . —w[ere] true? Ladies and gentlemen, the phone records." Oros argues, however, that the summary charts also suggested that he knew Johnson was a government employee taking a bribe, and not an expediter, because it showed they had frequent contact.

While a juror could plausibly have made this inference, the presence of other incriminating evidence weighs heavily against Oros's claims of prejudice. In short, the police found Oros in a Lexus, at a gas station, at midnight, exchanging thousands of dollars in cash with a government employee who later testified against him. With these damaging facts, Oros faced an uphill battle on the bribery charge. It is highly unlikely that a call log unfairly tipped the scales for the jury; therefore, any error the district court committed was harmless and a reversal is not warranted.

## B.  Sufficient Evidence Supported Oros's Conviction

Oros next argues that the evidence presented at trial was insufficient to find him guilty of bribery beyond a reasonable doubt. A defendant who challenges the sufficiency of the evidence to sustain his conviction faces a "nearly insurmountable hurdle." *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009) (citation omitted). The defendant must demonstrate that "no rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Knox*, 540 F.3d 708, 719 (7th Cir. 2008). "We do not reweigh the evidence, nor do we second-guess the jury's credibility determinations." *United States v. Boisture*, 563 F.3d 295, 298 (7th Cir. 2009). And "we uphold convictions based on uncorroborated testimony of an accomplice unless the testimony is incredible as a matter of law." *Woods*, 556 F.3d at 621 (citing *United States v. Van Wyhe*, 965 F.2d 528 (7th Cir. 1992)).

Johnson's testimony and the suspicious circumstances surrounding Oros's arrest easily support his conviction for bribery in violation of 18 U.S.C. § 666(a)(2). The statute imposes criminal penalties on a defendant who:

> corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2). Here, the government presented testimony that Oros paid Johnson $12,000 (which Oros does not deny), and Johnson testified that he was paid to subvert the permit application process and obtain approval for Oros's architectural plans. Johnson provided details about the amounts he had been paid in the past by Oros, and the other government employees he had used to facilitate his scheme. He also stated that he obtained zoning approval for buildings that were otherwise in violation of the zoning ordinance. Still, Oros argues that he believed Johnson was a legitimate expediter, and that Johnson's testimony cannot support a conviction. Specifically, Oros claims that Johnson lacked credibility because he was convicted of perjury in 1989 (for unlawfully obtaining employment benefits), and that he lied about reporting some of the cash he received from bribes on his income taxes.

Oros's claims amount to nothing more than an attack on the jury's credibility determination, which we have

repeatedly refused to revisit on appeal. *See, e.g., United States v. Bowman*, 353 F.3d 546, 552 (7th Cir. 2003). A witness's testimony is not per se incredible simply because he once committed perjury; instead, the prior conviction informs the jury's credibility determination. *See Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003); *cf. United States v. Zizzo*, 120 F.3d 1338, 1347 (7th Cir. 1997) (holding that a witness's "penchant for perjury" is not a reason to exclude his testimony, but provides the defense with an opportunity to undermine his credibility on cross-examination). The jury was well aware of Johnson's 1989 perjury conviction and still chose to believe his story—that the midnight gas station exchange was not a legitimate business deal—so its credibility determination shall remain undisturbed. The record is replete with evidence to support Oros's conviction.

## C. Sufficient Evidence Supported the Loss Calculation

Oros also challenges his sentence, arguing that the district court erred in calculating the amount of loss, which, in turn, determined his offense level. Once again, Oros attacks Johnson's credibility, arguing that Johnson's testimony was inadequate to support the court's loss calculation. In assessing the total loss amount, the court may consider the conduct of conviction as well as other relevant conduct. *United States v. Frith*, 461 F.3d 914, 917 (7th Cir. 2006). This may include uncharged or acquitted conduct as long as the court makes specific findings identifying the relevant conduct based on a

preponderance of the evidence. *United States v. Schaefer*, 291 F.3d 932, 938-39 (7th Cir. 2002). Further, during sentencing, courts "may consider relevant information without regard to its admissibility under the rules of evidence . . . provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3 (2004). We review the district court's loss calculation for clear error and "will only reverse if we are left with a definite and firm conviction that a mistake has been made." *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007) (internal quotation marks and citations omitted).

At sentencing, the district court determined that the amount of loss for Oros's offense was $59,000, which resulted in an adjusted offense level of 20. In reaching this amount, the court relied primarily on Johnson's testimony which revealed that Oros paid $45,000 to get his architectural drawings "approved through Zoning," including the $12,000 police recovered, and $1,000 on four or five different occasions to alter the data in the mainframe computer to reflect a larger number of permissible residential units than what the zoning ordinance actually allowed. Johnson also testified that Oros made payments to his coworker, Michael Reese, for additional "favors" in the Department of Buildings, which the court estimated to be approximately $10,000.[5]

---

[5] The court arrived at this estimate from Johnson's testimony that he and Reese shared $20,000 in cash bribes. Johnson

(continued...)

The court found this testimony to be credible and explained its reasons for doing so. Namely, Oros told an officer that he had met Johnson 20 to 30 times and paid him for rapid approvals of construction projects, and, in the court's view, this corroborated Johnson's testimony concerning the bribe payments. The court also noted the additional corroborative weight of the property and phone summary charts, both of which were permissible for the court to consider during sentencing, even if they were inadmissible at trial. *See* U.S.S.G. § 6A1.3; *see also United States v. Goodwin*, 496 F.3d 636, 642 (7th Cir. 2007) ("For sentencing purposes, the Federal Rules of Evidence do not apply . . . ."). For the same reasons mentioned in the previous section, Oros's attacks on Johnson's credibility do not carry much weight here. The district court found Johnson's testimony credible after considering all of the additional corroborating evidence presented at trial. Because we find no clear error in its determination, we defer to the district court's sentencing decision.

---

[5] (...continued)

later testified that Oros paid him a total of $45,000 in cash for six unit changes. It appears that the district court assumed Johnson included *his* share of the $20,000 in this tally, presumably to avoid double counting. Therefore, only Reese's share of the payment was added to Johnson's $45,000 total. Assuming that both men divided the $20,000 in half, Reese's share of the payment was approximately $10,000, which is what the court added to Johnson's total.

### III. CONCLUSION

For these reasons, we AFFIRM Oros's conviction and sentence.