In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-4088

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROLAND BORRASI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 916-2—**William J. Hibbler**, *Judge.*

ARGUED OCTOBER 22, 2010—DECIDED MAY 4, 2011

Before KANNE, TINDER, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Roland Borrasi, a medical doctor, was convicted of Medicare fraud after he accepted a salary from a hospital in exchange for continually referring patients to the facility, a violation of 42 U.S.C. § 1320a-7b. In this appeal, Borrasi attacks both his conviction and his sentence. We find that the district court did not err by admitting minutes from hospital committee meetings to prove attendance records while excluding

discussion of reports to which the minutes refer, as the latter constituted inadmissible hearsay. Because the Medicare fraud statute criminalizes payments when induction of referrals is among the purposes for the payments, we also find that the district court did not err in instructing the jury. Accordingly, we affirm his conviction. In addition, we find that the district court did not err in sentencing Borrasi. It reasonably estimated the loss amount in determining his offense level, it properly assessed a leadership enhancement to his offense level, and it expressed adequate reasons to sentence Borrasi to a longer term than his co-defendant. Accordingly, we affirm his sentence as well.

## I. BACKGROUND

Dr. Borrasi owned Integrated Health Centers, S.C. ("Integrated"), a corporate group of healthcare providers in Romeoville, Illinois. He worked primarily at nursing homes and hospitals. Through this work, he became acquainted with Chief Executive Officer Wendy Mamoon, Director of Operations Mahmood Baig, and other officers and directors of Rock Creek Center, L.P., a licensed inpatient psychiatric hospital in Lemont, Illinois. Reimbursements from the Medicare federal health care program constituted the vast majority of payments received by Rock Creek.

At some time between 1999 and 2002, Borrasi, Mamoon, Baig, and others conspired to pay bribes to Borrasi and other individuals at Integrated in exchange for an increasing stream of Medicare patient referrals. Doctors Zafer

Jawich, Bruce Roper, and Abhin Singla, as well as psychologist Agnes Jonas, were among those employed at Integrated at that time. Over that period, a sum of $647,204 in potential bribes was paid to Borrasi and Integrated physicians by Rock Creek. In 2001 alone, Borrasi referred approximately 484 Medicare patients to Rock Creek.

In order to conceal these bribes, Borrasi and other Integrated employees were placed on the Rock Creek payroll, given false titles and faux job descriptions, and asked to submit false time sheets. Borrasi, for example, was named "Service Medical Director" and was allegedly required to be available at all times; Baig later testified that Borrasi was not expected to perform any of the duties listed in his job description. According to minutes of Rock Creek's various committee meetings, Borrasi and some Integrated physicians occasionally attended meetings and submitted reports of their work. But they attended only a very small percentage of the actual meetings, and multiple witnesses testified to rarely seeing them in the Rock Creek facility for meetings or other duties. Jonas, Jawich, and Roper each testified that the Integrated physicians did not perform their assigned administrative duties, their reports and time sheets notwithstanding. Baig testified that he, Borrasi, and Mamoon did not expect the Integrated physicians to perform any actual administrative duties.

In addition, Rock Creek paid the salary for Integrated's secretary, as well as lease payments for one of Integrated's offices. This arrangement purportedly gave Rock Creek an outpatient clinic at Borrasi's building and certainly

supplemented Borrasi's rent. Further, Baig was paid both to oversee the admission and stays of Integrated's referrals to Rock Creek and also to ensure the referred patients were returned to nursing homes and facilities that Borrasi could access and control. These methods enabled Rock Creek and Borrasi to maximize their Medicare reimbursement claims.

In December 2006, a grand jury returned an indictment against Borrasi, Mamoon, and Baig, charging them with one count of conspiracy to defraud the United States government, in violation of 18 U.S.C. § 371, and six counts each of Medicare-related bribery, in violation of 42 U.S.C. § 1320a-7b *et seq*. Baig pled guilty to all seven counts, but Mamoon and Borrasi proceeded to trial. The three-week trial included testimony from Integrated and Rock Creek employees; documentary evidence comprising time sheets, attendance records from meeting minutes, and Medicare reimbursement claims; and recordings of Borrasi's conversations with Integrated physicians recorded by Singla, including one in which Borrasi admitted to referring patients in exchange for "free money" from Rock Creek. The jury returned verdicts of guilty on each count against Borrasi and Mamoon.

The district court then held a joint, two-day sentencing hearing for Borrasi and Mamoon. Both defendants were in criminal history category I. After considering the presentence report (PSR) and the parties' arguments regarding increasing the offense level to reflect the loss amount and enhancing the offense level due to their leadership roles, the court calculated Borrasi's offense

level at 28 (yielding a range of 78-97 months' imprisonment) and Mamoon's offense level at 26 (yielding a range of 63-78 months' imprisonment). The district court then heard the defendants' mitigation evidence, including testimony regarding a severely debilitating accident Mamoon's son had suffered that left Mamoon as his sole caregiver. The court sentenced Borrasi to seventy-two months' imprisonment and two years' supervised release. Mamoon was sentenced to six months' imprisonment, one year of home confinement, and five years' supervised release. Each defendant was required to pay $497,204 in restitution.

Borrasi then moved the district court to reconsider his sentence, arguing that it should be significantly lower to comport with Mamoon's. After holding a hearing on the matter, the district court denied his motion, concluding that the disparate sentences were justified by the facts of the case and the individual defendants' characteristics. Borrasi then timely appealed.

## II. ANALYSIS

Borrasi challenges both his conviction and his sentence in this appeal. He first argues that two errors during the guilt phase of his trial require a new trial. He then argues that, even if his conviction stands, we must remand for resentencing because of three errors during the sentencing phase. The government argues that the decisions about which Borrasi complains were not erroneous. We will consider each of Borrasi's five issues in turn, beginning with the alleged infirmities in his conviction.

*A. Challenges to Conviction*

At the conclusion of his trial, Borrasi moved for a new trial or, in the alternative, a judgment of acquittal, alleging twelve separate grounds for relief that included alleged evidentiary, procedural, and instructional errors. On appeal, he wisely limits his attack on his conviction to two allegations of error. *See Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 537 n.2 (7th Cir. 1992) ("[I]t behooves litigants to choose with care a few select issues for review, preferably those not forfeited by waiver."). His first allegation of error involves an evidentiary ruling, and the second focuses on the government's commentary during closing arguments regarding the statute he was charged with violating. We find neither argument persuasive.

*1. Exclusion of Hearsay*

Borrasi first argues that the district court erroneously interpreted and applied the Federal Rules of Evidence when it prevented him from using comments in meeting minutes during his defense, despite its earlier decision to allow the government to introduce the minutes into evidence and use them for a different purpose. According to Borrasi, this ruling prejudiced his case and warrants reversal of his conviction. We review the district court's decision to exclude the evidence or limit its use for an abuse of discretion, but we review its interpretation of the Rules *de novo*. *United States v. Rogers*, 587 F.3d 816, 819 (7th Cir. 2009). Even if we determine the evidentiary decision was erroneous, we will not reverse

it if the jury's ultimate decision was not influenced by the error. *United States v. Oros*, 578 F.3d 703, 707 (7th Cir. 2009).

The meeting minutes at issue were taken during Rock Creek committee meetings. The face sheet of each set of minutes lists attendees at the meetings. The government sought to introduce them to support its expert's summary of the attendance of Borrasi and his Integrated physicians at Rock Creek meetings. This summary purported to show that they did not participate sufficiently in their assigned committees to justify receiving salaries from Rock Creek for their respective activities. The government and Borrasi stipulated to the minutes' admissibility, and Borrasi now argues that the scope of the stipulation agreement was not limited to specific contemplated uses of the evidence.

Some of the minutes contained comments about committee reports submitted to Rock Creek's board of directors. Borrasi sought to introduce the minutes as exhibits so the jury could consider the information in those referenced reports, including the descriptions of medical services he and his employees allegedly performed for Rock Creek. He believed the substantive information in the reports—partially incorporated by the minutes—would refute the government's assertion that he and the other Integrated employees did not have to perform any work to receive a salary from Rock Creek.

On the government's objection, the district court ruled the minutes' substantive descriptions of the reports inadmissible because the statements would constitute

hearsay. It did allow Borrasi to examine Rock Creek witnesses about whether they received the reports, and Borrasi questioned Mamoon about the reports and committee meetings at length. Nevertheless, Borrasi contends that the exclusion was erroneous because the reports met the business-records exception to the hearsay prohibition.

Federal Rule of Evidence 803(6) excepts certain "records of regularly conducted activity" from Rule 802's general ban on the admission of hearsay evidence. Borrasi argues that hospital committee meeting minutes plainly fall within the scope of the business records exception because they were "record[s] . . . of acts, events, conditions, opinions, or diagnoses, made at or near the time . . . kept in the course of a regularly conducted business activity" and because it was Rock Creek's regular practice to take minutes of business meetings. Fed. R. Evid. 803(6). The district court accepted the parties' stipulation that the minutes themselves would fall within this exception. Borrasi now contends that, because the government did not limit the uses to which the minutes could be put upon their admission, it waived any opportunity to later limit the evidentiary uses to which he could apply the minutes. To support this broad premise, he cites Rule 105,[1] yet he cites no case for his proposition that the

---

[1] Federal Rule of Evidence 105 provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is ad-

(continued...)

Rule has such a preclusive effect at the moment of admission. Indeed, this argument inverts the very spirit of the Rule. Rule 105 is a vehicle for the enforcement of the Federal Rules of Evidence, but Borrasi's attorney would turn it into a trap—set upon admission of evidence and sprung later in trial—to effectively prevent enforcement of the Rules.

The meeting minutes almost certainly fell within Rule 803(6), especially given that—despite the involvement of Rock Creek officers in the fraudulent scheme—the government did not question the reliability of the documents. *See* Fed. R. Evid. 803(6) (excluding from the business records exception those records whose "source of information or . . . method or circumstances of preparation indicate lack of trustworthiness"). Borrasi, however, challenges the exclusion of the reports referenced in the minutes and any comments in the minutes regarding the substance of those reports. Those reports and any statements therefrom are hearsay, as each comprises statements written by physicians not testifying before the court that Borrasi wished to introduce for the truth of the matters asserted. *See* Fed. R. Evid. 801(c).

The government argues—and Borrasi does not refute—that Borrasi never laid any additional foundation for the admission of these reports or the minutes' substantive discussion of them. That alone justifies the district

---

[1] (...continued)
mitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

court's decision to bar the jury's receipt of the reports, as courts may not permit the introduction of hearsay contained within hearsay unless *each* layer is properly admitted under an exception to Rule 802. Fed. R. Evid. 805. Specifically, "statements made by third parties in an otherwise admissible business record cannot properly be admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception." *United States v. Christ*, 513 F.3d 762, 769 (7th Cir. 2008) (*quoting Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000)). Borrasi broadly concludes that the minutes are not "double hearsay" because the minutes did not contain statements of outsiders to Rock Creek, but rather statements of reports by Integrated physicians with privileges at Rock Creek. But he does not—and could not—argue that the reports were themselves trustworthy business records falling within Rule 803(6) or any other exception. Accordingly, the statements contained in the reports, as well as any quotations from or specific references to them in the minutes, constituted inadmissible hearsay.

The district court did not erroneously interpret Rules 802 and 803(6). It properly allowed Borrasi to argue that certain reports were made and then tendered during the meetings, and it allowed him to use the admitted minutes in an attempt to prove those arguments. But the court did not abuse its discretion in refusing to admit any substantive descriptions of the reports in the minutes or the reports themselves.

Had we found the exclusion erroneous, we would nevertheless have found it to constitute harmless error

because it could not have had a substantial and injurious effect on the outcome of the trial. *See Oros*, 578 F.3d at 709. Borrasi argues that he was prejudiced in his defense because he was barred from showing the jury that he and other Integrated physicians earned their salaries. Yet Borrasi was able to expound on this theory of defense throughout his cross-examinations, his case-in-chief, and his closing arguments. Even if the court allowed Borrasi to introduce the minutes' specific discussions of the reports purporting to show the Integrated physicians' work, it is highly unlikely that the evidence would have offset the overwhelming evidence that Borrasi and the other physicians were being paid in significant part for their referrals instead of their services. Baig testified that he paid kickbacks to Borrasi; Jawich testified that he did minimal administrative work for Rock Creek and that his contract's job description was not accurate; and the jury heard recorded conversations in which Borrasi described the "free money" Integrated received for their referrals. Accordingly, "any error the district court committed was harmless and a reversal is not warranted." *Id.* at 710.

### 2. Interpretation of 42 U.S.C. § 1320a-7b

Borrasi's second challenge to his conviction turns on the interpretation of the criminal statute he was charged with violating and conspiring to violate. Because medical services for the patients Borrasi referred to Rock Creek were paid for by Medicare, his referrals and conduct were subject to certain statutory restrictions. Borrasi was

charged, for example, with violating one statute designed to help combat health care fraud:

> [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1). The government theorized that Borrasi and the other Integrated physicians received payments—in the guise of salaries—from Rock Creek for their referrals of Medicare patients.

Borrasi points out, however, that the statute exempts some behavior from its coverage. It does not criminalize "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3). Seizing this language, Borrasi argues that the prosecution prejudicially misstated the law in its closing argument by suggesting that it did not matter if any portion of Rock Creek's payments to him or other Integrated physicians was pursuant to legitimate employment relationships because the statute was violated if any portion of the payments was for patient referrals. He contends that the government's argument to the jury nullified his

theory of defense and that the district court did not cure the misconduct by striking the argument and by giving an adequate curative instruction.

Because Borrasi's challenge to the district court's jury instructions necessarily implicates a question of law—the scope of § 1320a-7b(b)(3)'s exemption—we review the district court's instructions *de novo*. *United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009). We also review *de novo* whether a particular instruction was appropriate as a matter of law. *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010). We will affirm Borrasi's conviction if the jury instructions fairly and accurately summarized the law, and we will reverse only if the instructions misled the jury and prejudiced his defense. *United States v. Quintero*, 618 F.3d 746, 753 (7th Cir. 2010).

Borrasi urges us to adopt a "primary motivation" doctrine, under which the trier of fact would determine the defendants' intent in any given case and find them not guilty if the primary motivation behind the remuneration was to compensate for bona fide services provided. Under the primary motivation doctrine, the district court's instructions in this case would have been both inaccurate as to the law and inadequate to cure any prejudice from the government's statements during its closing arguments. He contends that such a construction is necessary both to avoid the possibility of conviction based on innocent or *de minimis* conduct and also to give effect to the rule of lenity in the face of statutory ambiguity.

Persuasive authority weighs heavily against Borrasi's proposal. He relies on *United States v. Bay State Am-*

*bulance and Hosp. Rental Serv., Inc.*, 874 F.2d 20 (1st Cir. 1989), where the First Circuit affirmed the appellants' convictions after "the district court instructed that the defendants could only be found guilty if the payments were made primarily as [referral] inducements." *Id.* at 30. But contrary to his allegation, there does not appear to be a circuit split regarding the appropriate interpretation of § 1320a-7b(b). The First Circuit did not decide in *Bay State* "whether the government must show that such payments were made primarily or solely with a corrupt intent." *Id.* Rather, it held that the district court's instruction at least "comport[ed] with congressional intent." *Id.* Each circuit to actually reach the issue has rejected the primary motivation theory Borrasi advocates. *See United States v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985) ("The text refers to 'any remuneration.' That includes not only sums for which no actual service was performed but also those amounts for which some professional time was expended."); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (holding that § 1320a-7b(b)(2) is violated whenever the benefits extended were partially to induce patient referrals); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) ("[T]he Medicare fraud statute is violated if 'one purpose of the payment was to induce future referrals.'" (quoting *Greber*, 760 F.2d at 69)); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000) ("[A] person who offers or pays remuneration to another person violates the Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals.").

We find the reasoning of the Third, Fifth, Ninth, and Tenth Circuits convincing, and we decline Borrasi's

invitation to create a circuit split. Nothing in the Medicare fraud statute implies that only the primary motivation of remuneration is to be considered in assessing Borrasi's conduct. We join our sister circuits in holding that if part of the payment compensated past referrals or induced future referrals, that portion of the payment violates 42 U.S.C. § 1320a-7b(b)(1).

The district court's instructions comported with this common-sense holding. The instruction tracked the language of § 1320a-7b(b)(1), combining it with a definition of remuneration. To convict Borrasi, the instruction required the jury to find—beyond a reasonable doubt—that some amount was paid not pursuant to a bona fide employment relationship. The trial court did not err in instructing the jury, and the government's comments during its closing arguments did not entitle Borrasi to a curative instruction. Because at least part of the payments to Borrasi was "intended to induce" him to refer patients to Rock Creek, "the statute was violated, even if the payments were also intended to compensate for professional services." *Greber*, 760 F.2d at 72.

### B.  Challenges to Sentencing

Borrasi also attacks his sentence, arguing that three errors require us to remand for resentencing. First, he alleges the district court did not make adequate findings as to his offense level based upon the value he received from his Rock Creek activities. Second, he contends the district court erred by increasing his offense level due to his purported leadership role in the criminal scheme.

Finally, he asserts that the great disparity between his sentence and that of his co-defendant warrants resentencing. We are unpersuaded by his three contentions and will affirm his sentence.

### 1. Sufficiency of Loss Calculation

Borrasi argues that the district court did not make findings as to the loss amount sufficient to determine the appropriate level of his offense. Specifically, he contends that the district court should have given him more than the $150,000 credit it gave him for the value of the actual services he performed for Rock Creek. According to Borrasi, the district court's findings lacked the requisite specificity to deny him a greater discount based upon his objections to the PSR. The government argues that any credit was inappropriate and that the loss amount should have been the full amount listed in the PSR.

Based on Borrasi's criminal conduct, the district court assessed his base offense level at 8 under U.S.S.G. § 2B4.1, Bribery in Procurement of Bank Loan and Other Commercial Bribery. That section requires augmenting the base offense level according to § 2B1.1, considering the value of benefits received through the crime. U.S.S.G. § 2B4.1(b)(1). After considering the PSR and arguments from both Borrasi and the government, the district court determined that Borrasi accepted bribes totaling $647,204, a sum that included the administrative salaries of Borrasi and his Integrated group, the value of the lease Rock Creek paid for Borrasi, and a portion of Baig's salary.

Borrasi did not object to that calculation, but rather argued that he should have received a significant credit against that amount based on the 24-hour on-call services his team rendered, their membership and participation in Rock Creek committees, and various administrative services they provided to Rock Creek.

The district court noted that the $647,204 loss amount corresponded to a 14-level increase. It then found that Borrasi had performed some valuable services for Rock Creek, but noted that it was difficult to measure the exact value of that benefit. The district court reduced the loss amount by $150,000 to "compensate for the efforts of the various individuals which did in fact benefit the patients at [Rock Creek], and some adjustment for the availability 24 hours a day of certain medical personnel to be at the beck and call for the residents of [Rock Creek]." (Sent. Tr. 52.) This reduction did not change the offense level, *see* U.S.S.G. § 2B1.1, but did reduce the restitution required of Borrasi to $497,204.

The loss amount calculated by the district court for sentencing is a factual determination, one which we review for clear error. *United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010). We will uphold the district court's loss calculation unless we are left with a definite and firm conviction that the district court made a mistake. *United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010). Our deference will not excuse an absence of findings al-together, *id.* at 886, but a court's findings need only be a reasonable estimate of the loss, *United States v. Christianson*, 586 F.3d 532, 537 (7th Cir. 2009). Borrasi's burden of

proof on appeal requires him to demonstrate that the district court's determination was inaccurate and outside the realm of permissible computations. *Id.*

Borrasi argues that he must be resentenced because the district court's determination of how much to reduce the loss amount—based on the fair market value of the services he rendered—was not sufficiently detailed to constitute a reasonable estimate based on the evidence. He asserts that the district court did not identify the formula or methodology it used and thus did not provide the particularity required for sentencing determinations.

We disagree with Borrasi's contention. The government proved the loss value to be $647,204. Borrasi did not object to that amount, and he bore the burden of providing "substantiated evidence . . . to counter the government's explicit proof of loss." *United States v. Gordon*, 495 F.3d 427, 432 (7th Cir. 2007). He needed to convincingly refute the government's proof with his own, but there was no testimony as to the value of the on-call services, and there was much evidence showing that the alleged administrative services were nonextant or *de minimis*. *See United States v. Sensmeier*, 361 F.3d 982, 989 (7th Cir. 2004) ("[W]hile we acknowledge that the burden is on the government to prove loss, the defendants' wholly unsubstantiated statements are not enough to undermine, nor even question, the court's acceptance of the government's proof of loss."). Were we to give effect to each of Borrasi's vague valuations, in fact, the credits for services rendered would have *exceeded* the total loss proven by the government. Ultimately, Borrasi has not

met his heavy burden of proving that the district court's determination was "outside the realm of permissible computations." *United States v. Peterson-Knox*, 471 F.3d 816, 822 (7th Cir. 2006) (*quoting United States v. Lopez*, 222 F.3d 428, 437 (7th Cir. 2000)).

The government argues—and from the cold record we are inclined to agree—that "if anything, the district court was overly generous in crediting Borrasi with $150,000" because the services he allegedly rendered were either illusory or valueless. (Appellee's Br. at 36-37.) The district court gave Borrasi the benefit of the doubt by crediting his alleged services in any amount, and it is the district court's lack of specificity in doing so that he now attacks. Granted, the district court could have been more specific in discussing how it calculated the credit against the loss amount generated by Borrasi's criminal activities. But we have previously found such estimation reasonable to determine the loss amount for sentencing, notably in a fraud case in which factual complexities about the existence and value of medical services abounded. *See United States v. Vivit*, 214 F.3d 908, 914-16 (7th Cir. 2000). Given the complexities of this Medicare fraud case, as well as the lack of evidence to establish the existence and value of any legitimately rendered services, we find the district court's estimate of the amount to credit Borrasi reasonable. The district court did not clearly err when it determined the loss value attributed to Borrasi's crime.

2. *Application of Leadership Enhancement*

Borrasi next argues that the district court was not justified in assessing a four-level leadership enhancement against him while assessing only a two-level enhancement against Mamoon. The district court increased Borrasi's offense level under U.S.S.G. § 3B1.1(a) after finding that he was an organizer or leader of Integrated and Rock Creek's criminal activities. Borrasi argues that the court did not consider the appropriate enhancement factors on the record. He also argues that he was only a middleman between the Integrated physicians and the Rock Creek hierarchy—a hierarchy that included Mamoon, who Borrasi venomously asserts should have borne the brunt of any leadership enhancement.

We review the district court's factual finding regarding the four-level enhancement for clear error, and Borrasi's arguments do not leave us with a "firm and definite conviction that an error has been made." *Tanner*, 628 F.3d at 907. The court explicitly adopted the PSR's assessment of the leadership enhancement. The PSR examined seven factors relevant in determining Borrasi's role in this criminal scheme, *see United States v. Curb*, 626 F.3d 921, 924-25 (7th Cir. 2010), and concluded that each supported the enhancement in this case. Of particular note, Borrasi actively recruited physicians into his scheme, controlled the Integrated physicians, solidified and expanded the relationship between Integrated and Rock Creek, and established Baig's role in Rock Creek's admissions department to facilitate the scheme. *See United States v. House*, 110 F.3d 1281, 1284 (7th Cir. 1997) (affirming organizer

and leader enhancement where the appellant was the common connection between the criminals, where he "brought . . . people together, both individually and as a group, to further the business of the conspiracies," and where he had substantial decision-making authority).

Although the district court assessed only a two-level enhancement to Mamoon, Rock Creek's CEO, her actual role in the fraudulent scheme was less extensive and fundamental than Borrasi's. We conclude that the district court did not clearly err in assessing a four-level enhancement to Borrasi based on his role in the offense.

### 3. Sentencing Discrepancy

Borrasi finally argues that his sentence was unreasonable because it was much longer than that imposed on his co-defendant. We review the district court's sentencing procedures, including its consideration of the 18 U.S.C. § 3553(a) factors, *de novo*. *United States v. Pulley*, 601 F.3d 660, 664 (7th Cir. 2010). If the court properly applied those procedures, we review the sentence's substantive reasonableness for an abuse of discretion. *Id.*

When determining the appropriate sentence for a given defendant, the district court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The district court found that the guidelines range was reasonable and fair for Borrasi, but gave him a minimal downward adjustment accounting for his medical

service to under-served groups; it ultimately sentenced him to 72 months' incarceration. By contrast, the district court found Mamoon's case to be outside the heartland of the statute, found her to be the critical caregiver for her profoundly disabled son, and found the guidelines range to be considerably longer than necessary to prevent Mamoon from re-offending; it ultimately sentenced her to 6 months' incarceration. In denying Borrasi's motion to reconsider his sentence based on this disparity, the district court explained that the discrepancy in sentencing was not only justified but demanded by their respective actions and circumstances.

Borrasi now argues that a plain application of § 3553(a)(6) mandates vacature of his sentence in light of Mamoon's, which he complains was markedly lenient compared to his own. We disagree because § 3553(a)(6) allows for *warranted* disparities among co-defendants' sentences. *Pulley*, 601 F.3d at 668. Here, the district court made individual, particularized sentencing determinations based on the § 3553(a) factors as to Borrasi and Mamoon during both the sentencing hearing and the hearing on Borrasi's motion for reconsideration. It followed the appropriate procedures and considered the avoidance of disparity in arriving at its sentences. We find that the district court properly calculated the guidelines range in Borrasi's case and that the below-guidelines sentence it imposed is reasonable. *See id.* at 668 ("[I]f the district court provides an adequate statement of reasons, consistent with § 3553(a), for believing that the sentence is appropriate, and it is within the Guidelines range, we presume the sentence is substantively reason-

able."). Accordingly, the district court did not err in sentencing Borrasi.

### III.  CONCLUSION

The district court erred in neither its evidentiary rulings nor its jury instructions, so we AFFIRM the district court's judgment of conviction. The district court reasonably estimated the amount of loss in determining Borrasi's offense level, properly enhanced the offense level due to his leadership role, and correctly considered and rejected his disparate sentencing argument. Accordingly, we AFFIRM the sentence imposed.