02-10-349-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00349-CV

 

 


 
 
 Woundkair Concepts, Inc., Dan Anderson, and Kim
 Anderson
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Richard F. Walsh, Medica-Rents Co., Ltd., and
 MED-RCO, Inc.
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

FROM THE 17th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellants
Woundkair Concepts, Inc., Dan Anderson, and Kim Anderson sued Appellees Richard
F. Walsh, Medica-Rents Co., Ltd., and MED-RCO, Inc.[2]
for breach of contract.  We will refer to the parties generally as “WCI” and
“Medica-Rents” except where context requires more specificity.  The trial court
granted summary judgment in favor of Medica-Rents.  In three issues, WCI argues
that the trial court erred by granting summary judgment, by finding that no
party was entitled to relief, and by sustaining objections to the affidavit of
Dan Anderson.  Because we hold that the trial court erred by granting summary
judgment, we reverse.

The Andersons
own Woundkair Concepts, Inc.  In 2004, the Andersons and Woundkair Concepts entered
into a contract (Marketing Agreement) with Medica-Rents Co., Ltd. and Walsh
(individually and as president of Medica-Rents’s general partner[3]).
 The agreement provided that it was effective from November 1, 2004 to October
31, 2011.

The Marketing
Agreement called for Woundkair Concepts to provide marketing services and for
Medica-Rents to act as a supplier.  Medica-Rents agreed to use Woundkair
Concepts “as its exclusive marketing agent.”  Medica-Rents was to hire and
maintain its own sales force “in its direct areas,” but Medica-Rents
salespeople were to “follow the direction of WCI sales management.”

In
the agreement, Woundkair Concepts agreed to use Medica-Rents “as its exclusive
supplier for ROHO mattresses, wound care supplies[,] and negative pressure
wound therapy.”  The agreement made Medica-Rents responsible for providing
product “for rental in acute care and home care venues” and “for sales to
accounts and individuals in the WCI areas.”  The agreement further provided
that Medica-Rents would bill for all product it provided and that Woundkair
would not bill any entity for Medica-Rents’s product without written consent
from Medica-Rents.  In the agreement, Medica-Rents agreed to pay a commission
to WCI of twenty percent “of gross collected revenue from wound care programs
promoted by WCI and billed through Medica-Rents[] (wound care dressings,
negative pressure wound therapy[,] and supplies).”

In
2006, WCI sued Medica-Rents for breach of the Marketing Agreement.  WCI alleged
that in order to avoid having to pay commissions that were due under the
agreement, Medica-Rents created alleged breaches by WCI of the Marketing
Agreement to manufacture a reason to terminate the agreement.

Medica-Rents
answered and filed counterclaims for breach of contract, conversion, unjust
enrichment, as well as for a declaratory judgment that the Marketing Agreement
was void for illegality.  Medica-Rents then filed a motion for summary judgment
asserting the defense of illegality, alleging that the contract was
unenforceable because it violated 42 U.S.C. § 1320a-7b of the federal Social
Security Act[4] and, therefore, violated
the public policy of Texas.

WCI
responded that Medica-Rents had failed to prove each essential element of a violation
of the Anti-Kickback Statute and that the evidence showed that WCI had not
knowingly and willfully intended to violate the statute, that the agreement
compensated them for acts that were not prohibited by the statute, and that the
Marketing Agreement was exempted from the reach of the statute by a bona fide
employment relationship among the parties.

The
trial court signed an order granting summary judgment for Medica-Rents based on
its finding that “the Marketing Agreement at issue in this lawsuit is an illegal
contract and therefore violates the public policy of the State of Texas.”  The
order further stated that “[a]ccordingly, . . . no party is
entitled to any relief for any claims of any other party.”

Standard
of Review

We
review a summary judgment de novo.[5]  We consider the evidence
presented in the light most favorable to the nonmovant, crediting evidence
favorable to the nonmovant if reasonable jurors could, and disregarding
evidence contrary to the nonmovant unless reasonable jurors could not.[6] 
We indulge every reasonable inference and resolve any doubts in the nonmovant’s
favor.[7]  A defendant is entitled
to summary judgment on an affirmative defense if the defendant conclusively
proves all the elements of the affirmative defense.[8] 
To accomplish this, the defendant-movant must present summary judgment evidence
that conclusively establishes each element of the affirmative defense.[9]

Analysis

WCI
argues in its first issue that the trial court erred by finding as a matter of
law that the Marketing Agreement is an illegal contract and therefore violates
the public policy of the State of Texas.

Neither
party argues that the Marketing Agreement is ambiguous.  The construction of an
unambiguous contract is a question of law for the court, which we review de novo.[10] 
We must examine the entire agreement to determine the parties’ intent and give
effect to each provision so that none is rendered meaningless.[11]

A
contract that cannot be performed without violating the law is void.[12]
 But a contract that could have been performed in a legal manner will not be
declared void merely because it may have been performed in an illegal manner or
because illegal acts were committed in carrying it out.[13] 
When two constructions of a contract are possible, a court should give preference
to the construction that does not result in violation of the law.[14] 
And when the illegality does not appear on the face of the contract, it will
not be held void unless the facts showing its illegality are before the court.[15]

Thus,
if the Marketing Agreement is not illegal on its face and could have been
performed in a legal manner, then the trial court erred by finding as a matter
of law that it is an illegal contract.[16]  And if the Marketing
Agreement is susceptible to two constructions, one of which would require a
violation of the law and one of which would not, we must give preference to the
construction that does not result in violation of the law.[17]
 We therefore consider the terms of the Marketing Agreement and the other
summary judgment evidence to determine whether the trial court correctly
determined that the Marketing Agreement is illegal as a matter of law.

Medica-Rents
asserted in its summary judgment motion that the Marketing Agreement is void
for illegality because it violates subsection (b)(1) of the Anti-Kickback
Statute.  This provision makes it a criminal offense when any person 

knowingly and willfully solicits or receives any
remuneration . . . directly or indirectly, overtly or covertly,
in cash or in kind—

(A) in return for referring an individual to a person for
the furnishing or arranging for the furnishing of any item or service for which
payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or
arranging for or recommending purchasing, leasing, or ordering any good,
facility, service, or item for which payment may be made in whole or in part
under a Federal health care program.[18]

The
Marketing Agreement provided that “Medica-Rents will use WoundKair Concepts,
Inc. as its exclusive marketing agent during the term of this agreement,” that
WCI would manage certain territories, and that WCI would receive twenty percent
“of gross collected revenue from wound care programs promoted by WCI and billed
through Medica-Rents.”  The agreement does not define the terms “marketing,”
“managing,” or “promoted,” nor does it describe what WCI’s duties would be
under these provisions or what types of activities would be included.[19] 
Medica-Rents concedes that the Marketing Agreement does not on its face violate
subsection (b)(1) and that “[n]othing in the [Marketing] Agreement explicitly
requires the party to perform an illegal task.”  The question, then, is whether
the summary judgment evidence shows as a matter of law that the Marketing
Agreement could not be performed in a way that does not violate this provision
of the Anti-Kickback Statute.[20]

As
an initial matter, we consider Medica-Rents’s assertion that WCI failed to
preserve its argument that “[e]vidence outside the Agreement does not
conclusively prove there is no way the Agreement can be performed in a legal
manner” because it did not raise this argument in the trial court.  Medica-Rents
moved for summary judgment on the ground that the contract was void for
illegality, and it was therefore Medica-Rents’s burden to establish this
affirmative defense as a matter of law.[21]  If Medica-Rents did not
meet this burden, then it was not entitled to summary judgment, and WCI was not
required to challenge the legal sufficiency of Medica-Rents’s summary judgment
ground in the trial court in order to make that challenge on appeal.[22] 
Furthermore, WCI’s response asserted generally that Medica-Rents had failed to
conclusively prove that the Marketing Agreement violated the Anti-Kickback Statute
and asserted specifically that “the evidence does not conclusively prove that
the agreement required [WCI] to engage in prohibited referrals or the
furnishing of Medicare-reimbursable items.”  WCI also asserted that the summary
judgment evidence raised a fact issue on each element of the subsection of the Anti-Kickback
Statute relied on by Medica-Rents.  We therefore reject Medica-Rents’s
contention that WCI failed to preserve its complaint for appeal.  We now review
the summary judgment evidence provided by Medica-Rents to determine whether
Medica-Rents met its burden of proof to show that the Marketing Agreement could
not be performed without violating § 1320a-7b(b)(1).

Subsection
(b) of the Anti-Kickback Statute is divided into two parts.  Subsection (b)(1)
addresses recipients of remuneration (that is, individuals who solicit or
receive remuneration in return for making referrals).  Subsection
(b)(2) addresses the other side of the transaction:  individuals who pay or
offer to pay remuneration in order to induce referrals.  Medica-Rents
did not allege in its summary judgment motion that the Marketing Agreement
violated subsection (b)(2), and we therefore do not consider whether the
agreement is illegal under that provision and consider only the applicability
of subsection (b)(1).[23]

Subsections
(b)(1) and (b)(2) are each further divided into two parts, with subparagraph
(A) addressing the referral of individuals, and subparagraph (B) addressing the
referral of services or goods.[24]  Thus, subsection
(b)(1)(A) prohibits the referring of individuals for the furnishing (or for the
arranging for the furnishing of) an item or service in return for receiving
remuneration for that referral.  This provision would apply, for example, to a
doctor who receives remuneration from a hospital in return for referring
patients to the hospital.[25]  The Marketing Agreement
would violate this part of the Anti-Kickback Statute if it called for WCI to
receive remuneration in return for referring individuals to Medica-Rents for
the furnishing of (or arranging for the furnishing of) Medica-Rents product, when
the individual’s payment for that product may be made by Medicare.[26]
 In this case, no evidence shows that the Marketing Agreement could not be
performed without violating this section.  No evidence showed that the
Marketing Agreement required WCI to refer individuals for goods or services.  Instead,
the only evidence on this question is the testimony of the Andersons in which
they stated that WCI did not did not refer individuals to Medica-Rents for the
furnishing of Medica-Rents goods.  Medica-Rents did not offer any evidence in
contravention of the Andersons’ testimony, such as testimony from Walsh, much
less evidence establishing as a matter of law that the Marketing Agreement required
WCI to obtain referrals or make sales.

Medica-Rents
points to Nursing Home Consultants, Inc. v. Quantum Health Services, Inc.
as support for its argument that the Marketing Agreement violated subsection (b)(1).[27] 
But the marketing agreement in that case differed from the one in this case. 
NHC served as an intermediary between nursing home residents and medical
suppliers.[28]  Quantum was a medical
supplier that provided its supplies to nursing home patients.[29] 
The agreement between NHC and Quantum called for NHC “to identify Medicare
recipients who needed the medical supplies that Quantum provided, and to put
those recipients in contact with Quantum.”[30]  Quantum would then sell
its products to the nursing home on behalf of the residents.  The agreement called
for NHC to refer persons who needed supplies to Quantum, and those supplies
were covered by Medicare.[31]  The agreement therefore
fell within the application (b)(1)(A).

In
this case, however, the agreement did not on its face require WCI to refer
persons who need Medicare-covered supplies (or anyone else) to Medica-Rents,
and the evidence does not show that the agreement could not be performed
without it doing so.  Because the evidence therefore did not show as a matter
of law that the contract could not be performed without violating subsection
(b)(1)(A), the trial court could not have properly granted summary judgment on
this ground.[32]

An
offense under subsection (b)(1)(B) may be committed based on a number of
different behaviors.  First, WCI would commit a criminal offense if it received
remuneration in return for purchasing, leasing, or ordering a product, if some
or all of the payment for the product may come from Medicare.[33] 
In reviewing the summary judgment evidence, we find no evidence that shows that
the Marketing Agreement required WCI to purchase, lease, or order Medica-Rents
product (the payment for which may come from Medicare) in exchange for
remuneration.  The trial court therefore could not have properly granted
summary judgment based on this part of the Anti-Kickback Statute.[34]

Subsection
(b)(1)(B) also makes it a criminal offense to receive remuneration in return
for recommending the purchase, lease, or ordering of a product, if some
or all of the payment for that purchase may come from Medicare.  Thus, the
Marketing Agreement would fall within this provision’s application if its
performance required WCI to recommend Medica-Rents products to potential
customers or to third parties who would in turn recommend Medica-Rents products
to potential customers, if the payment for the products may come from Medicare.

Medica-Rents
argues that the Marketing Agreement “requires Medica-Rents to pay commissions
to Appellants based on [WCI’s] promotion of Medica-Rents’[s] products.” 
Assuming that Medica-Rents is arguing that this provision required WCI to
recommend Medica-Rents products in violation of the statute, we conclude that
Medica-Rents did not establish this ground for summary judgment as a matter of
law.

Some
evidence raises a surmise or suspicion that WCI may have had a role in direct
marketing of Medica-Rents products, but it falls short of constituting a
scintilla of evidence of the fact, much less of establishing that fact as a
matter of law.[35]  Dan stated in his
affidavit attached to WCI’s response that Medica-Rents “purchased a $10,000
display booth for [WCI] to use at trade shows on behalf of Medica-Rents.”  But
Dan did not expound on what occurred at the trade shows and whether Kim or Dan
made direct contact with customers or potential sources of referrals for
Medica-Rents customers, and this evidence in no way showed that the Marketing
Agreement required them to attend trade shows or perform direct marketing.

Medica-Rents
also directed the trial court to Dan’s testimony at a hearing.  Although this
part of Dan’s testimony was not relied on by Medica-Rents in its summary
judgment motion, we note that at that hearing, Dan stated that the Marketing
Agreement contemplated that Medica-Rents would “eventually transfer all of
their current offices and all of their employees under Woundkair Concepts”
because “Medica-Rents no longer wanted to have its own sales force.”  The
agreement contained a section listing Medica-Rents offices that “are to be
transitioned to WCI,” but it contains no explanation of what the term
“transitioned” meant or what the transition encompassed, and in any case Dan’s
testimony suggests that this transitioning was never completed.  Neither party
points out or relies on this testimony in their briefs, and Medica-Rents did
not direct the trial court’s attention to this part of the hearing testimony
(or any specific part of the hearing testimony) as support for its arguments in
its summary judgment motion.  Even if Medica-Rents had relied on this evidence
in support of its motion, we conclude that this testimony is too vague and
ambiguous to constitute evidence that the Marketing Agreement called for WCI to
recommend Medica-Rents product as prohibited by the Anti-Kickback Statute.[36]

On
the other hand, WCI produced competent summary judgment evidence that WCI did
not deal with potential purchasers and did not recommend the purchase of
Medica-Rents products to anyone.  Kim testified that rather than soliciting
sources of referrals, she and her husband merely educated Medica-Rents salespeople
and were paid a percentage of the revenues from the business generated by the
Medica-Rents salespeople as a result of WCI’s education.  And in WCI’s response
to the summary judgment motion, it pointed out portions of Kim’s and Dan’s
deposition testimony in which they testified that under the agreement, they did
not personally market Medica-Rents’s product.  Kim testified that WCI “didn’t
obtain referrals” and that WCI “just educated [Medica-Rents sales staff] on
sales technique and products.”

Dan
testified that WCI’s “promotion” under the agreement did not include WCI
actively marketing the product but rather in “locating opportunities and
managing Medica-Rents sales personnel who actually marketed the products.”  Dan
testified that by “locating opportunities,” he meant that they would train
Medica-Rents salespeople on how to identify possible customers, such as
hospitals, long-term care facilities, or home health care providers.  He stated
that WCI did not try to locate patients who would use Medica-Rents products. 
And in Dan’s hearing testimony attached by Medica-Rents to its summary judgment
motion, Dan stated that the agreement called for WCI to be paid for managing employees,
stating, “That is what the contract is for.  Managing the sales force, that is
what I got paid for.”

Even
if the evidence had shown that in practice WCI violated this provision of the
Anti-Kickback Statute in its performance of the Marketing Agreement, nothing in
the evidence relied upon by Medica-Rents or by the Andersons in response showed
that WCI could not perform the contract without recommending
Medica-Rents products to others.  The trial court therefore could not have
properly granted summary judgment based on this part of the Anti-Kickback
Statute.[37]

Finally,
the statute prohibits a party from receiving remuneration in return for arranging
for the purchase, lease, or ordering of an item, the payment for which may come
from Medicare.  As stated above, the parties agree that the contract did not on
its face implicate this subsection.  But Medica-Rents argues that the summary
judgment evidence showed that the Marketing Agreement nevertheless could not be
performed without violating this part of the Anti-Kickback Statute.

In
Medica-Rents’s sur-reply brief, it contends that the evidence showed that the agreement
violated the Anti-Kickback Statute’s prohibition on “arranging for the
furnishing of any item” for which payment may be made by Medicare. 
Medica-Rents argues that agreement makes WCI responsible for “‘obtaining all
paperwork for billing as well as documentation required by the account, carrier[,]
or insurance company’” and that “[t]hus, [WCI] played a part in arranging for
the ordering of Medica-Rents’[s] products by obtaining the necessary
documentation, including insurance information.”  As it did in the trial court,
Medica-Rents also points specifically to Kim’s deposition testimony in which
she stated that under the agreement, “We were going to be managing their
facilities, employees, product placement, product pick up, service, maintaining
Medica-Rents’[s] inventory, and managing Medica-Rents salespeople.”

We
disagree with Medica-Rents’s view of the evidence.  Kim’s testimony and the
language of the agreement do not indicate that the Marketing Agreement called
for WCI to perform the kind of “arranging” prohibited by the statute.  The
“arranging” done by WCI appeared to be nothing more than completing necessary
paperwork for the sales of Medica-Rents product made by Medica-Rents
employees.  The evidence, rather than establishing as a matter of law that WCI
violated the Anti-Kickback Statute in its performance of the Marketing
Agreement, at the least raised a fact issue about whether it performed in a
legal manner.  And even if the evidence had not raised a fact issue about WCI’s
compliance with the law in its performance under the agreement, the summary
judgment evidence did not show as a matter of law that it was not possible for the
parties to perform under the Marketing Agreement without violating this part of
the Anti-Kickback Statute.

The
evidence, at the least, raises a fact issue on whether the commission payments
to WCI in this case were to compensate WCI only for services rendered, not for
activities prohibited by the statute, and were wholly attributable to WCI’s provision
of services to Medica-Rents.[38]  The evidence does not
establish as a matter of law that the agreement called for WCI to be
compensated as an inducement to generate business payable by Medicare.[39] 
Instead, the evidence suggests that Medica-Rents employees generate the
business and are the people doing the “arranging” that is governed by the Anti-Kickback
Statute. 

Cases
construing this statute do not suggest a different result.  The Fifth Circuit,
for example, has suggested that the statute only governs payments to
decisionmakers and that if the payments at issue are not made to a person in a
position to make referrals, then the payments are not prohibited by the
statute.[40]  Although the Miles
court construed subparagraph (b)(2)(A) and expressly did not consider whether
the activities in that case violated (b)(2)(B)—the counterpart to (b)(1)(B)
with respect to the payment of remuneration for referrals—it does not appear
that the court has expanded its application of the statute beyond payments to
individuals who are in a decision-making position to refer individuals for
services or to purchase goods or services and who could be improperly
influenced by the payments.[41]

Other
federal circuits take a broader view of the statute’s application, but even cases
from those circuits support our view that the statute does not apply to the type
of “arranging” called for by the Marketing Agreement.  In United States v.
Ruttenberg,[42] for example, the Seventh
Circuit stated the “obvious truisms” that Medicare kickback schemes not only
increase costs to the government, but can also freeze competing suppliers from
the Medicare system, mask the possibility of government price reductions,
misdirect program funds, and provide “strong temptations to order more . . .
supplies than needed.”  Based on the summary judgment evidence, none of these
concerns are implicated by the agreement here either on its face or in practice
because the evidence does not show as a matter of law that WCI had any
relationship with potential Medica-Rents customers or with sources of referrals
of potential customers.

Similarly,
the First Circuit has noted that “[t]he gravamen of Medicare Fraud is
inducement” and that “[g]iving a person an opportunity to earn money may well
be an inducement to that person to channel potential Medicare payments towards
a particular recipient.”[43]  Here, the summary
judgment evidence suggested that WCI was not in any position to channel potential
Medicare payments toward Medica-Rents.[44]

Furthermore,
regulations promulgated by the Office of the Inspector General of the
Department of Health and Human Services support the conclusion that the concern
of the statute is to limit the opportunity to provide financial incentives in
exchange for referrals.[45]  Medica-Rents did not
produce sufficient summary judgment evidence to establish as a matter of law
that the Marketing Agreement triggered application of the statute because the
summary judgment evidence is that WCI did not make any referrals, nor did it
make any recommendations to someone who is in the position to make referrals,
and it was not required to do so by the agreement.[46] 
Accordingly, the Marketing Agreement does not give the opportunity to provide
financial incentives to WCI in exchange for referrals or recommendations.

The
Inspector General has noted that with respect to marketing arrangements
involving health care goods and services, “[p]ercentage compensation
arrangements are potentially abusive . . . because they provide
financial incentives that may encourage overutilization of items and services
and may increase program costs.”[47]  In this case, however,
the concern raised by the Inspector General is not an issue because the summary
judgment evidence is that under the Marketing Agreement, WCI only “arranged” for
the ordering of Medica-Rents goods in that it processed the sales that had
already been made by Medica-Rents salespeople.  There is no opportunity for the
agreement to encourage overuse of items or services or increase Medicare
program costs because WCI did not sell product or point out sources of
referrals.[48]  The evidence does not
show that WCI was required by the Marketing Agreement to do anything related to
“arranging for” product purchases but take care of filling out paperwork and
shipping Medica-Rents product.[49]  The agreement simply
does not provide any financial incentives to WCI in exchange for directing
sources of business to Medica-Rents.  Medica-Rents did not establish as a
matter of law that the Marketing Agreement could not be performed without
violating this part of the Anti-Kickback Statute.

In
summary, the parties agree that the Marketing Agreement is not illegal on its
face, and Medica-Rents did not establish as a matter of law that WCI could not
perform the contract without violating § 1320a-7b(b)(1).  Accordingly, the
trial court could not have properly granted summary judgment on the ground that
the Marketing Agreement was void for illegality under this part of the
Anti-Kickback Statute.[50]  We therefore hold that
the trial court erred by granting summary judgment for Medica-Rents on the
ground that the contract was illegal under § 1320a-7b(b)(1).  Because we
reach our holding based on Medica-Rents’s failure to establish illegality as a
matter of law, we need not reach WCI’s argument that the agreement is not
illegal because it falls within the “safe harbor” for bona fide employment
relationships[51] or that Medica-Rents had
to establish that WCI knowingly and willfully intended to violate the law by
entering into the Marketing Agreement.

In
its second issue, WCI argues that the trial court erred by finding as a matter
of law that no party is entitled to any relief for any claims of any other
party, leaving the parties as the trial court found them.  WCI asserts that the
trial court found that “no party is entitled to any relief” and that this
finding was based only on the court’s finding that the Marketing Agreement was
illegal as a matter of law.  Because we have held that the trial court erred by
granting summary judgment, we overrule this issue as moot.

In its
third and final issue, WCI argues that the trial court erred by sustaining
objections to paragraphs two and four of Dan’s affidavit.  The objected-to
portions of the affidavit were statements made by Dan relating to whether he
and Kim had a bona fide employment relationship with Medica-Rents.  Because we
have held that the trial court erred by granting summary judgment because
Medica-Rents did not meet its burden of proof to show that the Marketing
Agreement is void for illegality, we need not consider whether the agreement
fell within the safe harbor for employment relationships.  We overrule this
issue as moot.

Conclusion

Having
sustained WCI’s first issue, which is dispositive, we reverse the trial court’s
summary judgment and remand this cause to the trial court for further
proceedings.

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and GABRIEL, JJ.

 

DELIVERED:  March 22, 2012









[1]See Tex. R. App. P. 47.4.





[2]MED-RCO is the general partner of Medica-Rents Co.





[3]Medica-Rents’s answer stated that Walsh signed this agreement “as
president of MED-RCO, the general partner of Medica-Rents,
Inc.”  The agreement does not actually state the name of the general partner,
however.  It states that he signed as “President of the General Partner”
of “Medica-Rents Co., Ltd.”





[4]42 U.S.C.A. §
1320a-7b (West Supp. 2011) (“the Anti-Kickback Statute”); § 1305 (West 2011) (stating that “[t]his
chapter may be cited as the ‘Social Security Act’”).





[5]Travelers Ins. Co. v. Joachim, 315
S.W.3d 860, 862 (Tex. 2010).





[6]Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).





[7]20801, Inc. v. Parker, 249 S.W.3d 392,
399 (Tex. 2008).





[8]Frost Nat’l Bank v. Fernandez, 315
S.W.3d 494, 508–09 (Tex. 2010); see Tex. R. Civ. P. 166a(b), (c).





[9]See Chau v. Riddle, 254 S.W.3d 453,
455 (Tex. 2008).





[10]Tawes v. Barnes, 340 S.W.3d 419, 425
(Tex. 2011).





[11]Id.





[12]Lewis v. Davis, 145 Tex. 468, 472–73, 199
S.W.2d 146, 148–49 (1947).





[13]Id.; Corporate Leasing Int’l, Inc.
v. Groves, 925 S.W.2d 734, 738 (Tex. App.—Fort Worth 1996, writ denied).





[14]Lewis, 199 S.W.2d at 149; Gupta v.
E. Idaho Tumor Inst., Inc., 140 S.W.3d 747, 752 (Tex. App.—Houston [14th
Dist.] 2004, pet. denied).





[15]Lewis, 199 S.W.2d at 149; Gupta,
140 S.W.3d at 752.





[16]See Groves, 925 S.W.2d at 738.





[17]See Lewis, 199 S.W.2d at 149.





[18]42 U.S.C.A. §
1320a-7b(b)(1).





[19]See Plano Surgery Ctr. v. New You Weight Mgmt. Ctr., 265 S.W.3d 496, 500–02 (Tex. App.—Dallas 2008, no pet.) (construing an agreement under
which PSC would manage day-to-day operations of a surgical center, New You would
provide “marketing services,” and the “net cash” from
surgical services would be divided between the two and holding that the
agreement was not facially illegal because neither “marketing services” nor
“net cash” was defined in the agreement and the agreement could be performed
lawfully by PSC paying New You a percent of “net cash” for “marketing services”
not involving the violation of the statute at issue in that case).





[20]See Lewis, 199 S.W.2d at 149; Gupta,
140 S.W.3d at 752.





[21]See Frost Nat’l Bank, 315
S.W.3d at 508–09.





[22]See City of Houston v. Clear Creek
Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979) (providing that on appeal, the
nonmovant may challenge the legal sufficiency of the grounds raised in the
summary judgment motion without first raising that challenge in the trial
court).





[23]See McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 341 (Tex. 1993) (stating that a summary judgment
motion “must stand or fall on the grounds expressly presented in the motion”).





[24]See United States v. Polin, 194 F.3d
863, 867 (7th Cir. 1999); see
also United States v. Stewart Clinical Lab., Inc., 652 F.2d 804, 806-07
(9th Cir. 1981) (construing the same language in a different section of the
Social Security Act).





[25]See, e.g., United States v. Borrasi,
639 F.3d 774, 776 (7th Cir. 2011).





[26]See 42 U.S.C.A. § 1320a-7b(b)(1)(A) (prohibiting
receiving remuneration “in return for referring an individual to a person for
the furnishing or arranging for the furnishing of any item . . . for which payment may be made in whole
or in part under a Federal health care program”).  The Anti-Kickback Statute
does not refer specifically to Medicare, using instead the term “federal health
care program.”  See 42 U.S.C.A § 1320a-7b(f) (defining “federal health
care program”).  For simplification and because the parties themselves refer to
payments by Medicare, in this opinion we will use “Medicare” to mean any
federal health care program that is implicated by the statute.





[27]926 F. Supp. 835 (E.D. Ark. 1996), aff’d, 112 F.3d 513 (8th
Cir. 1997).





[28]Id. at 838.





[29]Id.





[30]Id. at 839.





[31]Id. at 843.





[32]See Lewis, 199 S.W.2d at 149 (“[W]here
the illegality does not appear on the face of the contract it will not be held
void unless the facts showing its illegality are before the court.”).





[33]See 42 U.S.C.A. § 1320a-7b(b)(1)(B) (prohibiting the
knowing and willful receipt of remuneration in return for purchasing, leasing,
or ordering any item for which payment may be made in whole or in part under
Medicare).





[34]See Lewis, 199 S.W.2d at 149.





[35]See Serv. Corp. Int’l v. Guerra, 348
S.W.3d 221, 228 (Tex. 2011) (stating that evidence is more than a scintilla if
it would allow reasonable and fair-minded people to differ in their conclusions
and that evidence that does no more than create a surmise or suspicion is no evidence).





[36]See id.





[37]See Lewis, 199 S.W.2d at 149.





[38]See United States v. Kats, 871 F.2d
105, 108 (9th Cir. 1989) (stating that it is a correct statement of the law
that the Anti-Kickback Statute is violated unless the payment at issue was
“wholly and not incidentally attributable to the delivery of goods or
services”).





[39]Cf. Advisory Op. No. 97-4, 1997 WL
34684552, at *4 (Dep’t of Health & Human Servs. Office of Inspector Gen.
Sept. 25, 1997) (stating that a provider’s routine waiver of Medicare
copayments may violate the Anti-Kickback Statute because when providers “forgive financial obligations for reasons other than
genuine financial hardship of the particular patient, they unlawfully may be
inducing the patient to purchase items or services in violation of the
anti-kickback statute’s proscription against offering or paying something of
value as an inducement to generate business payable by” Medicare).





[40]See United States v. Miles, 360 F.3d
472, 480 (5th Cir. 2004).





[41]See id. at 480 n.3 (noting the appellants’ argument that
their conduct may have violated (b)(2)(B) because their payments to a marketing
service might have been “recommendations” to doctors who then “referred”
patients to the appellants and declining to speculate on the correctness of the
appellants’ arguments because they had not been charged with a violation of
(B)).





[42]625 F.2d 173, 177 n.9 (7th Cir. 1980).





[43]United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 29 (1st Cir. 1989).





[44]See also United States v. Greber, 760
F.2d 68, 71 (3d Cir. 1985) (“The statute is aimed at the inducement factor.”).





[45]See Medicare and State Health Care
Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952,
35,953 (Dep’t of Health & Human Servs. July 29, 1991) (stating that a proposed
regulation “set forth a safe harbor provision for joint ventures and other
arrangements involving payments for personal services or management contracts,
but only if certain standards are met that limit the opportunity to provide
financial incentives in exchange for referrals”) (rules codified at 42 C.F.R.
Part 1001).





[46]Cf. Med. Dev. Network, Inc. v. Prof’l Respiratory Care/Home Med.
Equip. Servs., 673 So. 2d 565, 566 (Fla. Dist. Ct.
App. 1996) (holding illegal a contract under which PRC agreed to pay MDN a
percentage of all business developed by MDN’s marketing of PRC’s durable
medical supplies to clients and whereby MDN would contact users of medical
equipment and promote the use of PRC’s equipment); see also Miles,
360 F.3d at 480 n.3.





[47]Advisory Opinion No. 98-1, 1998 WL 35287756, at *4 (Dep’t of Health & Human Servs. Office of Inspector Gen., Mar.
19, 1998).





[48]Cf. id. (addressing a marketing
agreement between A and B in which B was involved in active marketing,
“including direct contacts . . . to physicians who order and
dispense” the products made by A).





[49]See 56 Fed. Reg. 35,952, 35,973 (stating
that percentage contracts or contracts based on overall volume are not per se
violations of the statute).





[50]See Lewis, 199 S.W.2d at 149.





[51]See 42 C.F.R. § 1001.952 (2007) (providing
that the term “remuneration” in the Anti-Kickback Statute “does not include any
amount paid by an employer to an employee, who has a bona fide employment
relationship with the employer, for employment in the furnishing of any item or
service for which payment may be made in whole or in part” under Medicare).